Joseph Life, J.
These are two actions which Mr. Justice Joseph A. Suozzi in an order made July 18, 1972 directed to be tried jointly for the reason that they involved “ substantially the same issues of law and fact.” After an extended trial nothing was presented to alter that conclusion. In denying the application of plaintiff in each case for a preliminary injunction, Mr. Justice Suozzi said: ‘ ‘ There is a factual dispute with respect to the agreement containing the restrictive covenant. Moreover, it appears to this Court that plaintiff is merely a lessor of equipment and supplier of goods. There is little or no evidence that it produced, through its efforts, the only items of value referable to the injunction sought, i.e., the customer list and good will. *570 On the other hand, it would seem from the papers before this Court that both resulted from the efforts of defendant. (See Eeldmcm v. Douglas, 33 A. D. 2d 695.) ”
Each of the plaintiffs is engaged in “ industrial catering.” The management of the two companies is the same, the principals of Triple D & E Inc. (hereinafter referred to as Triple D & E) having acquired the assets of D & E Industrial Catering Inc. (hereinafter referred to as D & E). Industrial catering is an operation which has become familiar to us who have frequently seen these “ catering ” trucks halted at various locations throughout the county dispensing food and beverages to employees in office buildings, industrial plants, construction sites, places of public gathering, etc., etc.
The agreements on which plaintiffs rely were prepared on the same form and they are identical except for a very few items. Van Burén made his engagement with Triple D & E. Antinozzi had been employed by D & E when the ownership of that company was in different hands and continued as an employee after the assets, liabilities, etc. of D & E were acquired by the principals of Triple D & E: Still later his arrangement was altered so that he became what the company described as a “ contractor-distributor or contractor” (plaintiffs’ Exhibits 2 & 18).
The defendants urge that the exhibits (2 & 18) are not the agreements signed by them. They do not dispute their signatures but assert that items which are written into the two documents were inserted without their consent and after they had affixed their signatures. There is support in the record for their contention. For illustration, in Mr. Van Burén’s form contract the title of the company was altered and where it had been prepared for D & E the word “ Triple ” was inked in. This was in keeping with the company’s express policy that once it had acquired the assets of D & E all new contracts were made with Triple D $ E. Also, Antinozzi asserts that when he made his contract in January, 1965 he was paying less than the figures of $8 and $12 which appear in the appropriate blank spaces in paragraph 2, .subdivisions (h) and (i) of Exhibit 18.
In the restrictive covenant (par. 8) which describes the area to which that restraint applies, both contracts have the typewritten 5,000 feet, but in Van Burén’s contract it is altered in ink to 500 feet. He says that that was not in the contract when he signed it. Antinozzi’s claim is supported by the fact that paragraph 15 provides that the truck and route rentals shall never be increased beyond $20. That provision would be meaningless if it were $20 when the contract was made. Mr. John *571 De Rosa, secretary of the plaintiff, testified that in 1968 or 1969 when the company was engaged in negotiations. with another company, he inserted in certain of the contracts the names and addresses of contractors.
The company owned a number of industrial catering trucks. The garage (referred to as a “ bam ” by the parties) where the trucks were housed, included a commissary, storeroom and the facilities necessary to the operation of the "business. The agreements recited that the company had established various catering routes along which beverages, food products, tobacco, etc., etc., were sold and that the company had established “ a valuable trade and good will ” which represented an “ expenditure of time, energy and money ” by the company. The contractor undertook to sell the company’s merchandise exclusively on the route and the stops shown on the “ Exhibit A ” annexed to the agreement “ and at such other places, routes and stops as company may from time to time in writing approve and consent to.” The exhibit in each instance was not annexed to the contract although it was shown to the contractor when he entered into the arrangement. The route and the stops had been established by the plaintiff and its management, by prior employees or contractors, and in some instances had been acquired from another company.
The contractor was to pay the prices on the “ Company’s current price list ”, the company reserving to itself the right to change the price or prices as “need ” required. This arrangement which afforded no remedy to the contractor by review, arbitration, etc., resulted in the contract being deficient in a vital area and thus it was incomplete and unenforceable (55 N". Y. Jur., Specific Performance, § 19).
The contractor undertook to devote his full time to the operation; to make regular sales and distribution of the company’s products at scheduled times; to purchase all of his requirements from the company and to purchase nothing from anyone other than the company except with the company’s written permission. He "was'to furnish the company a list of the stops each week and to procure whatever individual permits were necessary. The company would secure and pay for all other necessary permits including license plates and insurance for the truck. The company was to maintain the truck except where repairs were necessary as a result of the contractor’s negligence, in which case the contractor was to pay. The contract contained a provision that in the event of a breakdown of the truck the company would endeavor to furnish another one. The contractor agreed to wear *572 uniforms or other clothing as prescribed by the company which were to be rented by the contractor from the company and maintained by the contractor. The contractor obligated himself not to divulge to others any information concerning the company’s stops, customers, etc. where these were turned over to him or acquired from the company; and then the agreement contained the following restrictive covenant: “ 8. The Contractor agrees not to carry or be engaged or in any manner concerned or interested, directly or indirectly for a period of one (1) year after the termination of his contract, in the sale, solicitation for sale or distribution of products that are similar or competitive to Company’s at any place within a radius of five hundred (500) feet from any stop or location served by him while under contract with the Company, or within a distance of five hundred (500) feotBKMiij<(^a@&S:)cfeet in every direction from any plant, factory, store, office, operation institution or other place of business or of industry or of human activity adjacent to or formerly served by him from any such stop or location. ’ ’ (The changes which the court has indicated in the foregoing did not appear in Mr. Antinozzi’s agreement, which was left at 5,000 feet.)
The agreement provided that the goodwill of the routes and stops as they existed initially or changed from time to time were the company’s property. Other clauses of the agreement were repetitious. One clause described the route and stops as a trade secret.
The contractor was required to return the truck to the company’s premises each night. The contractor could take his vacation but only under stipulated conditions. A holiday could not be taken without prior arrangement. There was no fixed term for the agreement except that it was to continue from month to month. Even that was cut down because the same provision stated that either of the parties could terminate the agreement on 14 days ’ prior written notice, except that the company could terminate the agreement without notice where the contractor violated its terms.
The company’s principal source of revenue was from the sale of merchandise. The contract provided a means of supervising the activities of the contractor, but these provisions were largely neglected and the contractors were permitted to operate at their own discretion. The company did little to assist the contractors in the development of their trade. "When stops on the route were lost others were acquired, with few exceptions, through thé efforts and industry of the contractors themselves;
*573 From time to time the company increased the charges for truck and route rentals and added charges for items previously furnished to the contractors without cost (e.g., propane and ice). In some instances a contractor was released from his obligation to rent a truck from the company and permitted to purchase his own truck and in that circumstance would continue to serve the same route, pay the route rental, and purchase his requirements from the company.
The contractors were not happy with their lot. Rentals and prices were increased when the company chose to do so. The protests of the contractors met with rebuff. We have said before that the company gave them very little assistance in developing routes. The contractors were disturbed by the competition of independent contractors who could purchase the same products from the company at lesser prices and were free to compete with the drivers along their routes. The contractors were not assured of income as employees would have been. The company did not hesitate to compete with the men by installing at various locations automatic vending machines for the sale of coffee and other items and the company distributed a brochure which solicited business for a cafeteria-like operation in offices, factories, etc.
We find that the contractors had no choice but to submit to the changes dictated by the company or to terminate their agreements. Of course where the driver was earning a livelihood in his operation and since he hoped to improve his income, he had no option but to bow to the superior position of the company.
At one time an item appeared in Neiosday in which the president of the plaintiff companies was reported as having expressed himself in favor of discontinuing the truck operations. This contributed to the insecurity of the contractors who undoubtedly met from time to time to talk over their grievances and fears. A number of them made an exploratory trip to a motor vehicle dealer to learn the price of trucks. We may assume that, whatever they did, found its way to the ears of the company’s executives. One contractor who was summarily discharged is the defendant in another lawsuit now awaiting the decision in these actions. These are some of the reasons which lead these defendants to conclude that their future and security lay in obtaining trucks and continuing as independents to serve their customers. They consulted and had the advice of counsel.
The second cause of action in each complaint alleges that the defendant entered into a conspiracy with certain of his fellow contractors. That term is a label applied to “ a combination *574 or agreement between two or more persons to do an unlawful thing, or to do a lawful thing in an unlawful manner. ” (8 N. Y. Jur., Conspiracy, § 1). There is a failure of proof to support the finding of conspiracy in this case and that cause of action in each complaint is dismissed.
Plaintiff’s prayer for relief is: “1. That the defendant be enjoined and restrained, and every person acting for or under him, and all of defendant’s aiders and abettors, for a period of at least one (1) year from the date of the. breach of contract, as herein set forth, and from in any manner, directly or indirectly, soliciting or attempting to solicit, servicing or catering to, or attempting to service or cater to, any of the plaintiff’s customers who were served by plaintiff during the period.that the defendant serviced plaintiff’s customers, and further enjoining and restraining the defendant, and any person acting for or under him, from divulging or making use of the knowledge and information acquired by defendant, with respect to plaintiff’s routes and route lists, and customers, and further enjoining and restraining defendant, and every person acting for or under him, from conspiring with anyone else to violate, in any manner, the restrictive covenant contained ip the aforesaid agreement.”
Essentially the foregoing expresses the relief which each plaintiff seeks.
Eeferring to the paragraph last quoted the customers would be plaintiff’s only if we were to adopt the company’s interpretation of the agreement — that a customer belonged to it no matter how it had been acquired.
The answers of the defendants are identical and in addition to the usual denials contain affirmative defenses generally alleging that the agreement annexed to the complaint is not the agreement signed by the parties; that the agreement is unconscionable, illegal and against public policy and that plaintiff was guilty of fraud in the inducement to the contract.
The denial or award of a temporary injunction does not establish the law of the case. The conclusion arrived at from the preliminary motion may be altered when all of the facts have been explored at a plenary trial (Walker Mem. Baptist Church v. Saunders, 285 N. Y. 462, 474; Hoppman v. Riverview Equities Corp., 16 A D 2d 631). For these reasons decisions made on a motion for a temporary injunction do not necessarily presage the determination after a full trial (e.g., Cater Cart Corp. v. Coban, 35 Misc 2d 702; Tbree-D Plus 1 v. Scott, N. Y. L. J., Oct. 28,1965, p. 18, col. 8); nor is the determination in Anbee Food Serv. v. Napoli (N. Y. L. J., Aug. 21,1969, p. 12, *575 col. 8) controlling. In the last case the arrangement was one of employment and the findings made by Mr. Justice Sullivan are substantially different from the factual conclusions arrived at here.
We have noted that once a contractor entered into an arrangement with the company he was left to his own devices and he prospered or failed as his efforts deserved. Of course the company invested time, effort and capital in the operation of its business and in acquiring routes and stops. Does ¡that give it a proprietary right which should be enforced against the contractors ! Anyone driving through the streets and thoroughfares of the county could discover places at which industrial trucks might sell their wares.
The company seeks to compel the contractors to desist from operating over the same routes and at the stops which they served prior to terminating their agreement. In each instance the route was furnished initially by the company. However, thereafter the route expanded over a larger area and the stops had changed to such an extent over the course of years as to become almost unrecognizable. In fact when it became apparent to the company principals that the contractors might quit, the company sent out certain of its principals to rediscover the stops.
As we see it, the company never acquired rights under the agreement because of the omission of an essential item (prices) in the contract which was left to unilateral determination by the company at a later date; the oppressive nature of the agreements ; the public policy which does not favor a restraint against employees who may be deprived of a living (Karpinski v. Ingrasci, 28 N Y 2d 45, 49; Purchasing Assoc. v. Weitz, 13 N Y 2d 267, 272); because it offends against public policy as being unreasonable when viewed in the light of section 340 of the General Business Law; because there was nothing of a secret nature in the knowledge which the employees acquired; and because of the breach of the agreements by the plaintiffs and the absence of good faith in their dealings with the contractors.
Corpus Juris Secundum defines a contract as “an agreement which creates an obligation. Its essentials are competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation.” (17 C. J. S. Contracts, § 1[1], par. a). The contracts here, lacking in mutuality, are not enforceable (Souveran Fabrics Corp. v. Virginia Fibre Corp., 37 A D 2d 925). The plaintiffs invoke the powers of the court to enforce the contract and they must demonstrate that their conduct has been such as to merit relief in equity. That relief *576 will be denied to the party who struck “too hard a bargain and too one-sided an agreement to entitle ’ ’ him ‘ to relief in a court of conscience. ’ ’ Equity will not enforce an unconscionable agreement (Campbell Soup Co. v. Wentz, 172 F. 2d 80, 83; 55 N. Y. Jur., Specific Performance §§ 4-7; 7A Weinstein-Korn-Miller, N. Y. Civ. Prac., pars. 6301.22, 6301.23). The party who breaches an agreement may not enforce the restrictive covenant (Cornell v. T. V. Development Corp., 17 N Y 2d 69, 75).
In making an agreement the contracting parties create obligations as between themselves. Where a form contract is employed with a few blank spaces to be filled at time of execution, there is a danger that the freedom of bargaining may be eliminated (cf. Campbell Soup Co. v. Wentz, supra). The law of contract generally contemplates that the parties would meet each other “on a footing of social and approximate economic equality ” (“ Contracts of Adhesion ”, 43 Col. L. Rev. 629, 630). Standard contracts are suspect and they may be contracts of adhesion in which the weaker party is obliged to accept what he is given or be denied whatever benefit there may be in the arrangement. The writer in the article last cited described these contracts (p. 632) 9-s being “ a prendre ou á laisser ”; in more familiar terms, ‘ take it or leave it. ’ ’ He furnishes as an illustration the situation where one party submits to a term which will be communicated to him later. (See, also, “ Employee Agreements not to Compete ”, 73 Harv. L. Rev. 625.)
In the instrument sub judice many obligations were imposed on the contractor. The company agreed to do little and reserved the right to change its terms as it pleased. The duration of the contract was of an ephemeral nature. The contractor could be- discharged and deprived of his means of earning a living by frivolous behavior on the part of the company. Thus the companies had squeezed out of the instrument and the arrangement whatever equity there was and whatever agreement there was in the sense of a meeting of the minds. Further, the behavior of the company which followed execution of the instruments constrains a court of equity to deny the relief they seek. A restrictive covenant will not be enforced of itself but only where it is ancillary to a valid agreement (Super Maid Cook-Ware Corp. v. Hamil, 50 F. 2d 830, 831; Paramount Pad Co. v. Baumrind, 4 A D 2d 944, affd. 4 N Y 2d 393). We find that there was not sufficient consideration to .support the promise of the restrictive covenant (8 Encyclopedia of N. Y. Law, Contracts, §2915).
Since the principal revenue of the plaintiffá came from the sale of merchandise to the contractors, the ageement comes within *577 the definitions of section 2-106 of the Uniform Commercial Code. Thus, under section 2-302 of that statute, the court may refuse to enforce an agreement when it is found to be unconscionable. This is a codification of the common law (e.g., O’Neil Supply Co. v. Petroleum Heat & Power Co., 280 N. Y. 50, 54) by which the Legislature .sought ‘ to carry equity practice into the sales field ’ ’ (Comment, McKinney’s Cons. Laws of N. Y., Book 62%, Uniform Commercial Code, § 2-302, p. 195).
The company deliberately adopted the device of engaging the drivers as contractors because it offered practical business advantages which may be readily recognized. For instance, it might have helped to avoid collective bargaining, workmen’s compensation, master and servant obligations to the public, etc., etc.
It is not the label but rather the behavior of-the parties which would characterize their relationship (28 N. Y. Jur., Independent Contractors, § 1 et seq.; cf. 62 N. Y. Jur., Unemployment Insurance, § 44). These contractors were employees because of the measure of control which the companies sought to exercise.
Interestingly, a State administrative agency has already determined that the relationship between one of the plaintiffs here and a contractor was an employment as a matter of law. The Appellate Division in the Third Department affirmed that finding in the following language: ‘ ‘ The question of the existence of an employment relationship is factual and where such a finding is supported by the evidence, it must be accepted as final and conclusive [supporting citations].” (Matter of D & E Catering Co. v. Catherwood, 33 A D 2d 1075, 1076). Another court has said that the sine qua non of employer-employee relationship is the matter of control (Binghamton Pub. Lib. Unit v. City of Binghamton, 69 Misc 2d 1005, 1009).
Not every restraint of trade is a violation of .section 340 of the General Business Law. It offends that statute when it is unreasonable (Big Top Stores v. Ardsley Toy Shoppe, 64 Misc 2d 894, 902, affd. 36 A D 2d 582; Purchasing Assoc. v. Weitz, 13 N Y 2d 267, supra). We find that the restraint sought to be imposed by the agreement here was unreasonable and therefore violates that section (cf. Paramount Pad Co. v. Baumrind, 4 N Y 2d 393, 397).
A restrictive covenant will not be enforced where the effect would be “ to protect plaintiff from ordinary competition, rather than to protect the plaintiff’s business against competition by improper and unfair methods ” (Rochelle v. Amendola, 11A D 2d 786, 787). The Court of Appeals has said in Karpinski v. *578 Ingrasci (28 N Y 2d 45, 53): “ The covenant, part of a contract carefully negotiated with no indication of fraud or overhearing on either side, must be enforced, insofar as it reasonably and validly may, according to its terms. ’ ’ The case presented by the plaintiffs fails to meet these tests.
Is there a distinction between this case and Heldman Catering Co. v. Douglas (33 A D 2d 695) ? There, the Appellate Division in this Department, in reversing the granting of a preliminary injunction at Special Term said that the relief should have been denied because among other reasons (supra, p. 696): “ Knowledge of the presence of the public on streets and the congregation of workers in industrial areas during coffee-breaks and lunch hours is readily obtainable by .those who would sell food and beverages tor them. Hence, appellants ’ use of such knowledge should not have been enjoined (cf. Town & Country House & Home Serv. v. Newbery, 3 N Y 2d 554).”
-The attorneys for the plaintiffs iniheir post-trial memorandum of law quote the restrictive covenant in paragraph 1 of the Heldman agreement as follows: “ ‘ to the general public of food and beverages along the roads, streets and thoroughfares ’ (emphasis supplied).” They go on to argue that because of that language the Heldman decision is not applicable here because the covenants are different. The agreements employed by the plaintiffs here and by the plaintiff in the Heldman case are strikingly similar. Examining the clause in the Heldman distributors’ agreement we find that the quotation by the plaintiffs is substantially altered by what follows. It reads in part: “ to the general public of food and beverages along the roads, streets and thoroughfares and at the outlets and stops in the area comprising the Territory hereinafter referred to and specified in the attached Territory Schedule.” (supra, pp. 695-696).
The language in paragraph 1 (a) of the agreement made with the defendants is: “To allow Contractor to sell, deliver and distribute catered products, distributed, catered or .sold by Company at the route and stops shown on Exhibit A, and at such other places, routes and stops as Company may from time to time in writing approve and consent to.”
The two covenants are .substantially alike.
For all of the reasons expressed we have arrived at the conclusion that the .relief sought by the plaintiffs must be denied and the complaint dismissed.