Rosalie M. ARLINGHAUS, Executrix of the Will of Frank H. Arlinghaus, and Rosalie M. Arlinghaus, individually, Plaintiff-Appellant,

v.

J. Richmond RITENOUR and John J. Lipsky, Defendants-Appellees,

and

Miriam Pepper and Sidney Pepper, Defendants.

No. 418, Docket 79–7483.

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 1980.

Decided May 14, 1980.

---

Preben Jensen, New York City (Casey, Lane & Mittendorf, New York City), for plaintiff-appellant.

Raymond P. O'Keefe, White Plains (Charles A. Scharf, P. C., New York City), for defendants-appellees.

Before FRIENDLY, MANSFIELD and KEARSE, Circuit Judges.

FRIENDLY, Circuit Judge:

This action, stemming from the sale of stock to the officers of a closely-held corporation, is before us for the second time, see 543 F.2d 461 (1976). It was brought in 1968 in the District Court for the Southern District of New York by plaintiff, Rosalie M. Arlinghaus, individually and as executrix of the estate of her husband, Frank M. Arlinghaus. The gravamen of the complaint was that defendants Ritenour and Lipsky, who were principal officers and also directors of Modern Teleservice, Inc. (Teleservice), and Sidney Pepper, who served as attorney for Mrs. Arlinghaus, for the estate of Frank Arlinghaus and for Teleservice, caused Mrs. Arlinghaus to sell stock in that company at what they knew to be an unconscionably low price, in breach of their fiduciary obligations and in violation of § 10(b) of the Securities Exchange Act and SEC rule 10b–5. Jurisdiction was predicated on diverse citizenship and also on § 10(b) and § 27 of the Securities Exchange Act.

After extended gestation, the action came to trial before Judge Werker in May, 1975. In an unreported opinion the district court dismissed all claims against Ritenour and Lipsky, but held Pepper liable for breach of fiduciary duty and ordered an accounting of profits accruing from the resale of shares sold to Pepper's wife, Miriam. While the accounting was in progress, the district court entered final judgment under F.R.Civ.P. 54(b) on the claims against Ritenour and Lipsky. Mrs. Arlinghaus took a timely appeal, which, however, this court dismissed for lack of jurisdiction after finding that a final judgment extending only to

Ritenour and Lipsky might prejudice a later appeal which we thought Pepper would be likely to take after his accounting. See 543 F.2d at 463–64. The accounting was not concluded until November 9, 1978. On March 7, 1979, Judge Werker entered final judgment against Pepper's estate for $509,-066 in compensatory and punitive damages, and again dismissed all claims against Ritenour and Lipsky as well as a separate claim against Miriam Pepper. The Pepper judgment was appealed by both sides, but a settlement for $175,000 was entered on September 17, 1979. This leaves before us Mrs. Arlinghaus' appeal of the dismissal of her claims against Ritenour and Lipsky.

This court's previous decision granted the parties leave to use the same submissions if the appeal was renewed, 543 F.2d at 464 n.4. Although availing themselves of this opportunity, they also submitted supplemental briefs and later, at this court's request, filed a third series of briefs on an issue raised by us at oral argument, namely, the extent of appellees' knowledge of the market value of Teleservice's shares at the time of the purchase from Mrs. Arlinghaus.

### The Facts

Teleservice, whose business was processing and distributing television commercials in New York and California, began as a division of Modern Talking Picture Service, Inc. (Talking Picture), a corporation founded by Frank Arlinghaus in 1937. Ritenour and Lipsky joined Talking Picture in the late 1940's, and, when Teleservice was spun off as an independent New York corporation in 1952, were appointed its president and vice president respectively. Their services were considered essential to Teleservice's success. Pepper, who had handled most of Talking Picture's legal work, likewise became counsel to Teleservice as well as continuing to serve as attorney for Frank Arlinghaus and, after his death, for Mrs. Arlinghaus and the estate.

When Frank Arlinghaus died in August, 1964, appellant became the owner, in practical effect, of the majority of Teleservice's 58,800 outstanding shares. As of April 25, 1967, she held 4,000 shares (6.8%) individually, 20,360 shares (34.6%) as executrix of Frank Arlinghaus' estate, and 8,400 shares (14.3%) distributed among three custodian accounts for her children. The seven remaining shareholders together owned 26,-040 shares (44.3%), of which 1,540 belonged to Ritenour and 700 to Lipsky.

From Teleservice's inception, its shares were restricted by a buy-back agreement which provided *inter alia* that the estate of a deceased shareholder could require the corporation to purchase its shares at a formula price for a period of three years after the shareholder's death.[1] Because Frank Arlinghaus' estate faced a large tax assessment, Mrs. Arlinghaus, Pepper and Clemens Arlinghaus, appellant's brother-in-law and a member of Teleservice's board of directors, met in late December, 1966 to discuss whether the funds needed to pay the tax assessment should be raised by exercising the estate's "put" option under the buy-back agreement. However, this course was rejected, in part because the formula price of $16.00 per share fell below the $20.00 price that the participants considered attainable, the agreement provided for full payment over a lengthy four-year term, and, according to Pepper's deposition, Teleservice might not have been able to afford to purchase the estate's shares in any event.

The estate's decision not to offer its shares for purchase by either the corporation or the remaining shareholders frustrated Ritenour and Lipsky's longstanding ambition to increase their Teleservice holdings.[2] By apparent coincidence, however,

---

1. The stockholders' agreement also provided that if the estate of a deceased shareholder failed to transfer its shares to the trustee or immediate family of the shareholder within one year after the appointment of an executor, the remaining shareholders and the corporation would receive successive thirty-day options to purchase the estate's shares at the formula price.

2. Ritenour testified to learning as early as 1965 that the estate was unlikely to make its shares available to the remaining stockholders, a claim that is consistent with the provisions of the stockholder's agreement, see note 1 *supra*. Ri-

the Teleservice board of directors authorized a search for potential merger or acquisition partners sometime during 1966, in the expectation that Teleservice alone might not be able to meet its growing capital needs. Ritenour and Lipsky not only carried out this mandate but simultaneously investigated arrangements that might also increase their holdings in Teleservice. On October 14, 1966, Ritenour spoke to Seymour Mintz, a business broker, about the prospect of obtaining financing for the purchase of Teleservice on Ritenour's behalf. Although the Mintz contact eventually led to more promising ones with other brokers, it produced only one company, Filmways, with a serious interest in Teleservice. According to Ritenour, Filmways was willing to "consider placing a price" on Teleservice of between five and eight times average earnings over the previous five years, that is, between $875,000 and $1,400,000 or $14.88 to $23.81 per share.[3] In addition to the Filmways negotiations, Teleservice was approached on a "yearly" basis by Chet Ross, the president of Bonded Film Services, a Teleservice competitor, to discuss a possible merger or acquisition deal. The record lacks any indication of the value placed on Teleservice by Ross until August 18, 1967, when Ross' company itself had been acquired by another firm; at that point, Ritenour related that Ross had also mentioned a price range between five and eight times average earnings. When Ritenour was asked whether he had responded to Ross' probes with a figure that Teleservice might find satisfactory, he stated "[i]f I did, it would have been around the 3,000,000 mark" (or $51 per share)—a proposal that, if made, would have been at some unidentified date between March 14 and August 18, 1967.[4]

In April, 1967, Ritenour's investigations began to bear some fruit. Through circuitous contacts beginning with Mintz, Teleservice was called to the attention of another broker, Harris Shapiro, who in turn organized a small syndicate of investors headed by one Lewis Stat (the syndicate). After brief negotiations, the syndicate agreed to finance a tender offer in the names of Ritenour and Lipsky for all outstanding shares of Teleservice. The agreement, embodied in a letter from Stat dated April 23, 1967, provided that if Ritenour and Lipsky could persuade Teleservice's shareholders to sell, the syndicate would merge Teleservice into a new corporation; that Ritenour and Lipsky would each receive a 12.5% interest in this corporation; and that, in addition, they would be "gifted" with 25% of the difference between the purchase price paid to Teleservice shareholders and $1,200,000 (in other words, the lower the price paid to the shareholders, the larger the cash bonus to Ritenour and Lipsky). A separate understanding with the syndicate provided inter alia that if the deal succeeded, Ritenour and Lipsky would receive five-year employment contracts with the new corporation at their established salaries.

On, or slightly before, April 25, 1967, Ritenour and Lipsky in consultation with Pepper drafted the terms of an offer for the syndicate to purchase Teleservice's shares at $15 per share. By his own admission, Pepper had hoped that a successful deal would yield him a commission from the "selling group", presumably the Teleservice shareholders. Shortly before the April 25

tenour's and Lipsky's longstanding desire for greater equity participation in Teleservice is evidenced by their unsuccessful attempt to meet an offer by Frank Arlinghaus to sell them the entire company for $275,000 in 1960.

3. Ritenour's deposition testimony indicated that Teleservice's average earnings over the previous five years had been roughly $175,000, hence the price range between $875,000 and $1,400,000.

4. Ritenour's deposition later retracted either the $3,000,000 figure or the dates involved. However, his trial testimony indicates that he may have used a $3,000,000 asking price on at least one other occasion, namely, in informal negotiations conducted with Screen Gems, see discussion infra. The record is also hazy about when these negotiations took place, but it is possible that they began as early as June, 1967. By generous inference, then, Ritenour's asking price for Teleservice was in the neighborhood of $3,000,000 during the spring or summer of 1967.

offer, he suggested that he might pressure his client, Mrs. Arlinghaus, into acceptance by threatening that Ritenour and Lipsky would resign otherwise. The district court credited Ritenour's and Lipsky's testimony that they had flatly declined this invitation. Nevertheless, Mrs. Arlinghaus claimed, and Judge Werker found, that Pepper made such threats on numerous occasions, and, indeed, that rumors of their impending resignation circulated back to Ritenour and Lipsky. Although the record indicates that both Mrs. Arlinghaus and her brother-in-law, Clemens, learned that the syndicate or something like it existed, there is no suggestion that they knew the terms of its agreement with Ritenour and Lipsky or of the substantial interest of Ritenour and Lipsky in consummating the deal.

With one exception, Teleservice's minority shareholders accepted the $15 offer. On May 10, 1967, Mrs. Arlinghaus met with Pepper, Clemens Arlinghaus, Ritenour and Lipsky to discuss the offer in a meeting, about which there was conflicting testimony at trial. Ritenour claimed that he had expressly denied rumors that he and Lipsky would resign if the syndicate deal failed; Mrs. Arlinghaus could recall no such denial; and Clemens asserted that, far from assuring loyalty, Ritenour and Lipsky had actually threatened resignation. The district court credited Ritenour's testimony, but thought that appellant might have mistaken the evident enthusiasm of Ritenour and Lipsky for consummating the deal as an implicit threat to resign if it fell through. In any event, the meeting ended inconclusively and was immediately followed by a second discussion among Mrs. Arlinghaus, Clemens, and Pepper, during which it was decided to make a counteroffer to sell to Ritenour and Lipsky at $20 per share. Appellant testified that but for the threats of resignation she would never have agreed to the $20 price. However, the district court discounted this claim in light of both Mrs.

Arlinghaus' need to raise funds for the estate tax assessment and earlier discussion of the $20 figure as a desirable price to receive for the estate's shares from the corporation.

The counteroffer was made and accepted, the remaining shareholders assented, and a closing was set for June 9, 1967. Given the terms of the syndicate's separate agreement to give Ritenour and Lipsky a 25% share of the corporation, the $20 offer to Teleservice's shareholders represented an actual cost to the syndicate of $26.80 per share. As the closing approached, the syndicate scrambled to raise the necessary $1,182,000 ($1,176,000 for Teleservice's outstanding shares and $6,000 in bonuses for Ritenour and Lipsky). A June 6 telegram from Stat to Ritenour gave assurances that the funds were available, in part because Lehigh Valley Industries, a possible source of financing, would contribute its own stock on the basis of a future earnings formula that estimated Teleservice's total value "in excess of two million dollar[s]." There is little to substantiate Stat's account of the Lehigh Valley formula, since the syndicate ultimately failed to raise necessary funds by the day of the closing.

The failure of the syndicate deal initiated a flurry of activity. On June 11 or 12, two days after the aborted closing, Ritenour met with John Stevenson, a friend and wealthy investor, to explore the possibility of financing the purchase of Teleservice shares at a $20 price and on terms similar to those offered by the syndicate. On June 14, the Teleservice board authorized Ritenour and Lipsky to retain a financial consultant to represent Teleservice in a sale of assets. With this mandate, Ritenour contacted Smith, Barney & Co., which, as Ritenour recalled, indicated a price "yardstick" for Teleservice assets of between five and twelve times earnings or from $14.88 to $35.70 per share.[5] In addition, beginning as

5. A formal representation agreement was concluded between Teleservice and Smith, Barney on July 25, 1967. Although the latter firm participated in at least two exploratory meetings with potential buyers, nothing seems to

have developed from these discussions. During the same time frame, Ritenour met with several other possible buyers on his own including representatives of the *Los Angeles Times* and Lehigh Valley Industries. However,

early as June 9 and continuing through the following weeks, Ritenour and Lipsky began to explore the possibility of a direct purchase of Teleservice's stock—a possibility that was the subject of several discussions with, *inter alios*, Pepper who expressed interest in becoming a participant in any deal that was afoot. These discussions culminated in a successful offer to Teleservice shareholders.

In the case of Mrs. Arlinghaus, the terms of the Ritenour-Lipsky-Pepper offer are contained in three letters drafted by Pepper. Two letters authorized the respective transfers of 4,000 shares of Teleservice, appellant's entire personal holdings, and 9,104 shares, or approximately 45% of her holdings as executrix of Frank Arlinghaus' estate, to Lipsky, Ritenour's wife, and Miriam Pepper at a total price of $10 per share—$3 payable immediately and $7 payable within a year after transfer.[6] The third letter detailed the terms of the transaction including separate repurchase option agreements between appellant and Ritenour. These agreements provided that if Mrs. Arlinghaus failed to receive at least $20 per share for the 2,800 shares held in each of the custodian accounts for her three children within a year, Ritenour would return the 4,000 shares sold by appellant personally at the $10 sale price; and that if appellant

failed to receive at least $31.64 per share for the estate's remaining holdings, the stock sold by the estate would be returned on the same terms. In short, Mrs. Arlinghaus was to sell 40% of the total Arlinghaus holdings at $10 per share on the condition that she would receive an average price of $27 per share for the stock remaining in the custodian and estate accounts.[7] She was thus assured of an average price for her entire holdings of at least $20 per share—the same price which she had proposed in the aborted syndicate transaction. Teleservice's minority shareholders (other than Ritenour and Lipsky) each received similar offers for 40% of their holdings. A separate understanding allotted 37.5% of the outstanding shares purchased to Ritenour, 37.5% to Lipsky, and 25% to Miriam Pepper.

Appellant's acceptance of the offer was manifested by her signed approval of the June 30 letters of agreement drafted by Pepper and by her written consent, dated July 26, 1967, to the release of these letters.[8] However, the basis for her decision is clouded by her testimony that she "had in mind" the prospect of resignation by Ritenour and Lipsky if she refused; by the district court's finding that she acted in total reliance on Pepper; and by that court's finding that Ritenour and Lipsky failed to

---

*so far as the record shows, these meetings produced neither offers nor estimates of Teleservice's value.*

6. Only one of the two transfer letters drafted by Pepper was in evidence. After the letters were drafted, Ritenour's name was substituted for that of his wife as a purchaser of Teleservice shares.

7. After the proposed sale, Mrs. Arlinghaus' holdings would comprise 11,256 shares in the estate's account and 8,400 shares in the custodian accounts. Thus, Mrs. Arlinghaus was assured an average price on these shares of [(11,256 × $31.64) + (8,400 × $20.00)] divided by (11,256 + 8,400), which equals $26.67 per share. The district court observed, at note 9, that

    [t]he very working of the sale agreement . . . put plaintiff on notice that the defendants fully expected to arrange a sale of the stock at a minimum of $27 a share, more

than twice the price offered [in the July, 1967 offer].

In addition, appellant's work sheets indicate that she was well aware that she would obtain an average price of at least $20 per share for the entire Arlinghaus holdings including the shares sold to Ritenour, Lipsky, and Pepper.

8. The parties dispute the exact date on which the agreement with Mrs. Arlinghaus was consummated. Appellees point to the July 1 date on which Ritenour committed himself to the repurchase offer. Mrs. Arlinghaus points to yet another letter indicating Pepper's agreement not to release the letters of agreement containing her signed approval until after the other shareholders had accepted. At the latest, the agreement was concluded on July 26, when Mrs. Arlinghaus agreed in writing to the release of her approval. We accept the later date.

provide any assurance of loyalty after May 10.[9]

Following the in-house sale of 40% of Teleservice, the search for a sale or merger partner for the entire company continued unabated. On September 13, 1967, Screen Gems, a company that had previously negotiated with Ritenour, offered $1,500,000 in stock for Teleservice, with an additional maximum of $1,000,000 in stock payable over a five-year period if certain earnings requirements were met. Similarly, negotiations with another potential purchaser, Fuqua Industries, began as early as the last week of August, 1967, and culminated on November 17, when Fuqua offered roughly $3,000,000 of its own stock, equivalent in value to $51 for each share of Teleservice. Although this offer was accepted, Fuqua withdrew it shortly before the scheduled March 5, 1968 closing date upon learning that Teleservice's earnings for the preceding year had failed to match Ritenour's forecast.[10] Ironically, however, Harris Shapiro, the organizer of the unsuccessful syndicate deal, stepped into the breach by arranging negotiations with yet another potential purchaser, the Sonderling Broadcasting Company.[11] On March 25, 1968, Sonderling agreed to purchase Teleservice in exchange for 130,000 of its shares, worth $29.75 each on the date of closing. As Shapiro received 10,000 Sonderling shares for his brokerage fee, the Teleservice shareholders netted 120,000 shares of Sonderling—an equivalent of $60.71 per share of Teleservice. Mrs. Arlinghaus obtained 22,971 shares of Sonderling for the 11,256 shares of Teleservice held by Frank Ariinghaus' estate and presumably obtained an additional 17,143 shares of Sonderling for the remaining Teleservice stock in her children's custodian accounts. Thus the average price that appellant obtained for the sale of her entire holdings including the earlier sale to Lipsky, Ritenour and Pepper, was $41.03 per share.

### The Decision Below and the Appeal

The district court dismissed all claims against Ritenour and Lipsky after concluding that they had never threatened Mrs. Arlinghaus with resignation; that they had made routine reports on all negotiations bearing on Teleservice's value to the directors and to Pepper as Mrs. Arlinghaus' attorney, and were under no further obligation to report to Mrs. Arlinghaus herself; and that they had not conspired with Pepper, either expressly or tacitly, to defraud Mrs. Arlinghaus and were therefore not liable for Pepper's actions. With respect to Pepper, by contrast, the court found liability for breach of fiduciary duty on two grounds: that he had intentionally misrepresented the prospects of Ritenour and Lipsky's resignation in order to encourage a sale and thereby acquire either a commission or an interest in Teleservice and that he had concealed from Mrs. Arlinghaus

the fact that negotiations for the sale of [Teleservice] indicated a probable corporate value of two to three million dollars.

Any such knowledge on Pepper's part could only have come from Ritenour and Lipsky.

As previously noted, Mrs. Arlinghaus settled her claims against Pepper while this appeal was pending. She now attacks the district court's dismissal of her claims against Ritenour and Lipsky, urging, first,

---

**9.** The record contains no evidence of specific instances of threats or rumors of threats after the May 10, 1967 meeting, see the description supra. However, Mrs. Arlinghaus testified that the threats from Pepper were continuous. Much less clear is whether Ritenour and Lipsky received fresh indications that Pepper's threats continued after the denial on May 10.

**10.** We do not know what the earnings or the forecasts were. Indeed the record is singularly barren of evidence of Teleservice's earnings beyond what is stated in note 3 *supra*, or why they turned out to be so highly prized.

**11.** Shapiro had also been active on Teleservice's behalf while negotiations with Fuqua were in progress. In late fall of 1967, Shapiro placed Pepper in contact with Wometco, a potential purchaser that, according to Pepper, offered a yardstick acquisition price of $2,000,000 providing that Teleservice's net income reached $200,000 for the year. As Fuqua's offer was considerably more generous, nothing came of the Wometco negotiations.

that the district court erred in concluding that adequate disclosure to Pepper also constituted disclosure to Mrs. Arlinghaus; second, that Ritenour and Lipsky, as officers and directors of Teleservice, owed a duty of full disclosure of Teleservice's value to appellant under both the doctrine of *Strong v. Repide*, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909), as incorporated in New York law and § 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder; and, third, that Ritenour and Lipsky are jointly liable for Pepper's breach of his fiduciary duty to Mrs. Arlinghaus under New York law so long as they both knew of and benefited from that breach.

### Discussion

■■■ Insofar as the court's decision rested on the premise that disclosure by Ritenour and Lipsky of the value of Teleservice to Pepper constituted disclosure to Mrs. Arlinghaus, it was in error. Third party disclosure to an agent is not imputed to the principal when the agent is acting adversely to the principal's interest and the third party has notice of this, Restatement (2d) Agency, § 271 (1958).[12] See *Benedict v. Arnoux*, 154 N.Y. 715, 727–30, 49 N.E. 326 (1898); *Otsego Aviation Service, Inc. v. Glens Falls Ins. Co.*, 277 App.Div. 612, 102 N.Y.S.2d 344, 349 (3d Dep't 1951); *Farr v. Newman*, 14 N.Y.2d 183, 189–91, 250 N.Y. S.2d 272, 276–78, 199 N.E.2d 369, 372–373 (1964); *Otsego Mutual Fire Ins. Co. v. Darby*, 79 Misc.2d 80, 84–96, 358 N.Y.S.2d 314, 318–19 (S.Ct.Fulton Co.1974); 2 N.Y.Jur., Agency § 268 (1958). Thus, from the moment Ritenour and Lipsky learned of Pepper's self-interested scheming, they could no longer satisfy any disclosure obligations they might have to Mrs. Arlinghaus merely through communications with Pepper. Of course, at some point during late June, 1967, Mrs. Arlinghaus herself learned of Pepper's interest in the July, 1967 sale, but continued to allow him to act as her agent. It is arguable, then, as the district court

intimated, that Mrs. Arlinghaus would be estopped from asserting lack of disclosure for *additional* valuation developments made known to Pepper but not to her after she learned of his adverse interest. See *Mittendorf v. Williston & Beane, Inc.*, 372 F.Supp. 821, 829 (S.D.N.Y.1974). We need not decide this, however, in view of the district court's finding, see discussion *infra*, that the very terms of the in-house sale indicated the buyers' belief in July, 1967, that they could obtain at least $27 per Teleservice share and our conclusion that there was no evidence that before then anyone had specific information of a higher value.

We also question whether, if Ritenour and Lipsky had had specific indications that the stock was worth more - than the value attainable under the July, 1967 agreements, the district court would have been correct in concluding that a general disclosure to the board of directors that the stock was worth more, even giving weight to Clemens Arlinghaus' directorship, would have satisfied their obligations. This was a closely held corporation and the two top officials owed a special duty of disclosure to the widow of the founder and majority stockholder, violation of which would give rise to liability both under the doctrine of *Strong v. Repide, supra*, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853, see 3 Loss, Securities Regulation 1447–48 (1961), which appears to be the law of New York in the case of small, closely held corporations, see *McManus v. Durant*, 168 App.Div. 643, 660–64, 154 N.Y.S. 580, 592–94 (1st Dep't 1915); *Saville v. Sweet*, 234 App.Div. 236, 237–38, 254 N.Y.S. 768, 770–71 (1st Dep't 1932) (dictum), aff'd 262 N.Y. 567, 188 N.E. 67 (1933); contrast *Fischer v. Guaranty Trust Co.*, 259 App.Div. 176, 18 N.Y.S.2d 328 (2d Dep't 1940), aff'd 285 N.Y. 679, 34 N.E.2d 379 (1941), and under Rule 10b–5, see *Dupuy v. Dupuy*, 551 F.2d 1005 (5 Cir. 1977) (Wisdom, J.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312,

---

**12.** Restatement (2d) Agency, § 271 provides:
A notification by or to a third person to or by an agent is not prevented from being notice to or by the principal because of the fact that the agent, when receiving or giving the notifi-

cation, is acting adversely to the principal, *unless the third person has notice of the agent's adverse purposes.* [Emphasis added.]

54 L.Ed.2d 197 (1978). We need not decide this, however, since we find nothing in the record to show that prior to the July, 1967 agreements Ritenour and Lipsky had sufficient reason to believe that Teleservice could command a sales price substantially in excess of $20 per share ($1,117,600 for the 58,800 shares), the price which Mrs. Arlinghaus proposed in the never consummated syndicate deal and which would have to be realized in order to prevent rescission of the in-house deal, see footnote 7 *supra*, to require direct disclosure to Mrs. Arlinghaus under the principles laid down in the cases just cited.

The facts have been set forth above and need not be repeated here. The Filmways discussions of late 1966 which were reported to the Teleservice board on December 12, 1966, produced a price range between $875,000 and $1,400,000, or $14.88 to $23.81 per share; $20 was slightly over the midpoint. We attach little significance to the $3,000,000 asking price possibly put forward by Ritenour to Ross and Screen Gems before July, 1967; there is no indication that either Ross or Screen Gems manifested any interest in such a figure. Perhaps the strongest argument that Ritenour and Lipsky knew that the stock was worth significantly more than $20 per share was the agreement with the Stat syndicate, which, because of the secret deal with Ritenour and Lipsky, involved an effective price of $26.80 per share. However, as Mrs. Arlinghaus knew, that deal collapsed when the syndicate failed to obtain adequate financing. Equally important, Judge Werker found that the terms of the Ritenour-Lipsky-Pepper offer alerted Mrs. Arlinghaus to the fact that the buyers believed that they could obtain at least $27 per share of Teleservice, see note 7 *supra*. Thus the pricing information withheld during the syndicate negotiations was revealed, at least in part, by the terms of the July, 1967 offer itself. Five days after the date set for the closing under the syndicate agreement, Teleservice's board was sufficiently uncertain about the price at which the company could be sold that it retained a well-known Wall Street firm to advise it. The firm's report attested the dubieties inherent in the sale of a relatively small service business by giving a range of from $14.88 to $35.70 per share. The $20 figure which was the real price under the Ritenour-Lipsky-Pepper offer, see note 7 *supra*, was not far below the midpoint of this range. The later offers have only remote evidentiary significance since we do not know what happened to Teleservice's earnings in the meanwhile. Apart from this, except for the Sonderling offer some nine months after the July, 1967 agreements, these cannot bear the weight that appellant would place on them. Screen Gems' September 13, 1967 offer was $1,500,000, with the prospect of up to an additional $1,000,000 if certain earnings requirements were met, but there is no evidence what these requirements were, much less that they would have been met. Fuqua's November 17, 1967 offer of about $3,000,000 in stock is the first that would support the judge's conclusion that negotiations for the sale of Teleservice indicated "a probable corporate value of two to three million dollars", but this offer was withdrawn when Teleservice's earnings, whatever they were, failed to meet Ritenour's forecasts, whatever these may have been. Only by assuming that something going at least part way toward Sonderling's March 25, 1968 offer seemed reasonably assured in July, 1967, could the judge's conclusion be justified, and we see no sufficient evidence of this. Although Ritenour and Lipsky may have hoped for such an offer in July, 1967, we find nothing in this history to suggest that they had learned any facts sufficiently indicative of Teleservice's true value, as later developed, to require them either under the common law of New York or under Rule 10b–5 to seek out Mrs. Arlinghaus and expressly advise her that Teleservice's value might far exceed the $20 per share she had been willing to accept from the syndicate and was assured of obtaining for her entire holdings under the July, 1967 agreements.

■ We have considered whether we may properly affirm on a ground of lack of knowledge by Ritenour and Lipsky as to the value of Teleservice which was not relied

upon by the district court (indeed is contrary to one of its conclusions in finding liability on the part of Pepper) and, what is more important, which was not pressed by Ritenour and Lipsky on appeal prior to this court's questioning at argument and later request for additional briefing. The fact that the judge's conclusion of a $2–3 million value known to Pepper in July, 1967, was not contested by appellees by a separate cross-appeal is no obstacle since, under the rule of *Langnes v. Green*, 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520 (1931), the judgment of a lower court may be affirmed without cross-appeal on the basis of "any argument that is supported by the record, whether it was ignored by the court below or flatly rejected." 9 Moore, Federal Practice ¶ 204.-11[3], at 4–45 (2d ed. 1980) (footnote omitted). See *Dandridge v. Williams*, 397 U.S. 471, 475–76 & n.6, 90 S.Ct. 1153, 1156, 1157, 25 L.Ed.2d 491 (1970). To be sure, the *Langnes* rule is subject to certain limitations including the well-established bar against theories advanced by appellees without a cross-appeal which challenge some aspect of the lower court's judgment. See 9 Moore, Federal Practice, *supra*, ¶ 204.-11[3], [4]. We thus might question the propriety of rejecting the valuation finding were this to unsettle any portion of the district court's judgment, including the resolution of claims against Pepper. See generally Stern, When to Cross-Appeal or Cross-Petition—Certainty or Confusion?, 87 Harv.L.Rev. 763 (1974) (exceptions to the *Langnes* rule). Even with respect to Pepper, however, our rejection of the valuation finding leaves the district court's judgment intact. The first and principal ground for Pepper's liability was the district court's determination that he had breached his fiduciary obligations as counsel to Mrs. Arlinghaus and her husband's estate by falsely representing that Ritenour and Lipsky threatened to resign if they could not acquire a substantial interest in Teleservice.

This determination finds ample confirmation in the record, and would support the judgment against Pepper regardless of the valuation finding or the larger question whether the Ritenour-Lipsky-Pepper purchase was made with adequate disclosure to Mrs. Arlinghaus.[13] In any event, the judgment against Pepper now stands inviolate as a result of the settlement between his estate and Mrs. Arlinghaus.

■ The issue thus narrows to whether the failure of Ritenour and Lipsky to attack the $2–3 million valuation in this court prior to our raising the point at oral argument should bar a decision resting on a rejection of the district court's conclusion on that score. As indicated above, an appellate court may consider any argument or theory that finds support in the record and will serve to sustain a correct lower court decision. See, e. g., *Helvering v. Gowran*, 302 U.S. 238, 245–46, 58 S.Ct. 154, 157–158, 82 L.Ed. 224 (1937). Although authority is sparse, this rule obtains even when the appellate court raises the decisive theory *sua sponte*. See *Cold Metal Process Co. v. McLouth Steel Corp.*, 126 F.2d 185, 189 (6 Cir. 1942) (dictum); cf. *City of Vero Beach v. Rittenoure Inv. Co.*, 113 F.2d 269, 272 (10 Cir. 1940) (recent change in law raised *sua sponte*). To be sure, appellate courts must tread cautiously over terrain that the parties have failed to explore on appeal. Any issue injected into the appeal by the court itself must have been adequately presented below, and the parties must have had a full opportunity to develop the relevant facts. See *Heirs of Fruge v. Blood Services*, 506 F.2d 841, 844 n.2 (5 Cir. 1975). In addition, the appellate court should have the benefit of thorough briefing before considering a decisive issue or rationale. See *Paskaly v. Seale*, 506 F.2d 1209, 1211 n.4 (9 Cir. 1974). In this case, however, all three conditions are met. Ritenour and Lipsky heatedly de-

---

**13.** Pepper was bound by a higher standard of fiduciary duty than Ritenour and Lipsky. New York Law imposes the highest level of fiduciary duty on all aspects of an attorney's dealings with his client. *See Whitehead v. Kennedy*, 69 N.Y. 462, 466 (1877) (attorney dealing with

client must make "reasonable use" of client's confidence; the client must have "full knowledge of all material circumstances known to the attorney" and be "free from misconception"). *See also* 3 N.Y.Jur., Attorney-Client §§ 68, 69 (1958).

nied advance knowledge of Teleservice's market value in their post-trial brief to the district court; the same question had been among the principal subjects of deposition and trial testimony; and this court's invitation to submit supplemental briefs has provided Mrs. Arlinghaus ample opportunity to canvass the record in order to support the conclusion that the defendants had learned of a probable $2–3 million sale price before the end of July, 1967.[14]

■ Appellant counters that if this court rejects the district court's valuation conclusion *sua sponte*, she will have been denied the opportunity to have raised in her reply brief or her first supplemental brief additional theories of liability that she would have advanced if appellees had challenged the valuation conclusion in theirs. Even if appellant was entitled so to reserve a point, which may be doubtful, see 9 Moore, Federal Practice, ¶ 228.02[2.–1] (1980 ed.), citing *Mississippi River Corp. v. F. T. C.*, 454 F.2d 1083, 1093 (8 Cir. 1972), fairness requires no more in this case than that we accord full consideration to the one theory that Mrs. Arlinghaus claims to have excluded from her briefs as a result of appellee's failure to attack the valuation conclusion, namely, the argument that Ritenour and Lipsky are liable for all of Pepper's actions as fellow participants in a conspiracy to obtain Mrs. Arlinghaus' shares of Teleservice through fraud, coercion and breach of fiduciary duty.[15]

As developed in appellant's post-trial brief below, the existence of the alleged conspiracy is said to rest on the joint participation of Pepper, Ritenour and Lipsky in the 40% purchase from Mrs. Arlinghaus; on their joint participation in drafting both the syndicate and 40% purchase offers; on Ritenour's and Lipsky's knowledge of Pepper's willingness to use coercive tactics; on Ritenour's and Lipsky's failure to reassure Mrs. Arlinghaus of their loyalty prior to the 40% purchase offer; and on Pepper's manifest desire to profit, either by a commission or by direct participation, from any successful purchase of the Arlinghaus stock. From these facts, appellant urges the inference of an explicit or tacit agreement that Pepper was to be rewarded for persuading appellant to sell to Ritenour and Lipsky. The district court rejected this claim in light of its findings that appellees had instructed Pepper not to threaten their resignation and had expressly denied such threats to Mrs. Arlinghaus at the May 10 meeting. On the record before us, we cannot disagree.

■ Under New York law, a defendant may be held liable in tort for conspiracy "to do an unlawful thing, or to do a lawful thing in an unlawful manner," 8 N.Y.Jur., Conspiracy § 1, at 494 (1959). See, e. g., *Triple D & E, Inc. v. Van Buren*, 72 Misc.2d 569, 573–74, 339 N.Y.S.2d 821, 827 (Sup.Ct. Nassau Co.1972), aff'd, 42 A.D.2d 841, 346 N.Y.S.2d 737 (1973). Given our determination that despite Pepper's delicts, the 40% purchase would not have been fraudulent if accomplished by Ritenour and Lipsky alone, the claim must be that appellees conspired with Pepper either to pursue the 40% purchase by unlawful means or to aid Pepper in the breach of his fiduciary obligations. The district court's findings present an insuperable obstacle to both theories. On the most generous reading of the record compatible with those findings, the basis for charging Ritenour and Lipsky would have to be that, despite their May 10 repudiation of resignation threats, they acquiesced in Pepper's continuing assertions of such threats, which they learned of indirectly

---

**14.** Appellees' failure to challenge the $2–3 million valuation on appeal is rendered somewhat more comprehensible, though no less regrettable, by the tentative phrasing of that conclusion, its placement among the district court's conclusions of law rather than findings of fact, and its restricted function in the district court's opinion as an alternative ground for establishing Pepper's liability.

**15.** In addition to the supplemental briefs which we requested both sides to file after the argument, counsel for Mrs. Arlinghaus filed a "reply to appellees' second supplemental brief". The brief does not develop the conspiracy theory, although this had been done in appellant's post-trial brief in the district court, which we have also examined.

through the unabated flow of rumors. But such behavior, even if badly motivated, hardly establishes a conspiracy absent "intentional participation with a view to furtherance of the common design," *Bedard v. La Bier*, 20 Misc.2d 614, 617, 194 N.Y.S.2d 216, 220 (Sup.Ct.Clinton Co.1959). Not only is evidence of a common design lacking here, but as Ritenour's trial testimony suggested and the district court found, appellees were initially cool to Pepper's participation in the in-house purchase. Even if a common design were imputed, however, acquiescence fails to rise to the level of participation at least without an affirmative duty to act. The court found that in April, 1967, Ritenour and Lipsky had instructed Pepper not to assert threats on their parts and had emphatically denied these threats at the May 10 meeting. They were under no obligation to volunteer repeated reassurances even if they knew Pepper was repeating the threats, and, in the light of Mrs. Arlinghaus' views of their intentions, such reassurances would have been unlikely to be effective in any event.

This is a close and has been a troubling case. In affirming we bestow no medals of honor on Ritenour and Lipsky. Although their desire to have a stake in the enterprise is understandable, they were not entitled to pursue that goal by means that were unfair to Mrs. Arlinghaus. In particular we do not condone their conduct in concealing the secret side agreement under which the syndicate would have given them 25% of the corporation, thereby bringing to $26.80 the true price to be paid by the purchasers rather than the $20 per share offered the stockholders, and under which they were to receive cash bonuses for driving the price down. If the syndicate purchase had closed, Mrs. Arlinghaus might well have been able to rescind it. However, accepting, as we do, the judge's version that Ritenour and Lipsky repudiated Pepper's stories of their threats to resign and finding no sufficient evidence that prior to July 26, 1967, they had any such knowledge of a realizable price for Teleservice in excess of $20 per share as to require direct communi-

cation to Mrs. Arlinghaus, we are constrained to affirm.

It is so ordered. No costs.