UNITED STATES of America, Plaintiff,

v.

FEDERAL INSURANCE COMPANY and Cometals, Inc., Defendants.

Court No. 82–05–00594.

United States Court of International Trade.

March 14, 1985.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, and Barbara M. Epstein, Dept. of Justice, Civil Div. Commercial Litigation Branch, New York City, for plaintiff.

Serko & Simon, New York City, David Serko, Margaret H. Sachter, and George S. Locker, New York City, for defendants.

WATSON, Judge:

The plaintiff brought this action against the importer, (Cometals, Inc.), and the importer's surety, Federal Insurance Company, in order to recover approximately $230,-344.12 in import duties, plus interest. It is before the court on the plaintiff's motion for summary judgment, defendants' opposition thereto and their cross motion for summary judgment on their counterclaims for equitable recoupment.[1] There is no dispute as to the facts.

Underlying this action is the plaintiff's failure to obtain payment of import duties, despite Cometal's transmittal of the money owed, to its broker, James Loudon & Co. (Loudon).

In this decision, the Court finds that the plaintiff-government disregarded its own regulations, interpreted a decisive regulation unlawfully, and disregarded the manifest intention of Congress. Thus, sole responsibility for not receiving the duties that are claimed to be owed by the defendants, must be attributed to the plaintiff's malfeasance. In short, the government is equitably estopped from recovering on its claim.

This action has its origin in the importation by Cometals of titanium sponge. As a result of the entry involved Cometals owed approximately $230,344.12 in import duties. Loudon, after receiving the necessary funds from Cometals on or about May 2, 1980, tendered its own *uncertified* check in the amount of $230,344.12 on May 12, 1980, as payment to the Customs Service for the duties owed by defendant-importer.

On May 29, 1980, however, this check was returned to Customs by the Bank of America because of insufficient funds in Loudon's account. Customs then requested and subsequently received a second check from Loudon on June 12, 1980. This check was also returned by the bank because of insufficient funds. Finally, after the Customs Service's direct demands for payment from Loudon proved futile, it turned to the defendants for payment.

It should also be noted that the government had audited Loudon in October of 1977, and that audit had revealed a severe net worth deficiency. The September, 1977, financial statement, which the government admits it obtained as a result of this audit, showed that Loudon's liabilities exceeded its assets by over $164,000 and that it was responsible for more than

---

**1.** In an earlier decision the Court dismissed counterclaims made by defendants under the Federal Tort Claims Act (28 U.S.C. § 2671 et seq.), the Tucker Act (28 U.S.C. § 1491), and the Administrative Procedure Act, 5 U.S.C. § 701 et seq., *United States v. Federal Ins. Co. and Cometals Inc.,* 6 C.I.T. ——, (Slip Op. 83–118, November 15, 1983).

$190,000 in overdrafts. Despite this fact, no further audits were conducted by the Customs Service.

Moreover, in late 1979, and early 1980, six of Loudon's uncertified checks covering Cometal's entries were returned to the government because of insufficient funds.[2] Nevertheless, the government continued to re-deposit those checks or to accept new checks from Loudon.

## I

Regulations promulgated by the Customs Service provide a detailed procedure for the payment of duties. *See generally,* 19 C.F.R. § 24. The tender and acceptance of uncertified checks is governed by 19 C.F.R. § 24.1(3) which reads as follows:

19 C.F.R. § 24.1(3)

(3) *An uncertified check drawn by an interested party* on a national or state bank or trust company of the United States or a bank in Puerto Rico or any possession of the United States if such checks are acceptable for deposit by a Federal Reserve bank, branch Federal Reserve bank, or other designated depository *shall be accepted if there is on file* with the district director *an entry bond or other bond* to secure the payment of the duties, taxes, or other charges, *or if a bond has not been filed, the organization or individual drawing and tendering the uncertified check has been approved by the district director to make payment in such manner.* In determining whether an uncertified check shall be accepted in the absence of a bond, the district director shall use available credit data obtainable without cost to the Government, such as that furnished by banks, local business firms, better business bureaus, or local credit exchanges, sufficient to satisfy him of the credit standing or reliability of the drawer of the check. [emphasis supplied]

The government argues that when it accepted the uncertified checks in question from Loudon it was acting in compliance with 19 C.F.R. § 24.1(3). According to the government, as long as there was a bond on file, *even if it was a bond posted by the importer,* it was acting in accordance with the law.

The Court finds that the government's interpretation of 19 C.F.R. § 24.1(3) violates three sections of the law which are in *pari materia;* 19 U.S.C. § 66, 19 U.S.C. § 1641(d) and 19 U.S.C. § 1648.

19 U.S.C. § 66 requires that all regulations prescribed by the Secretary of the Treasury relating to the collection of duties from importation must *not* be inconsistent with the law.

**§ 66. Rules and forms prescribed by Secretary**

The Secretary of the Treasury shall prescribe forms of entries, oaths, bonds, and other papers, and rules and regulations *not inconsistent with law,* to be used in carrying out the provisions of law relating to raising revenue from imports, or to warehousing, and shall give such directions to customs officers and prescribe such rules and forms to be observed by them as may be necessary for the proper execution of the law. [emphasis supplied]

19 U.S.C. § 1641 deals with the regulation of brokers. When enacting 19 U.S.C. § 1641(d) Congress expressly stated that the Secretary of the Treasury *shall* promulgate rules and regulations regarding Customs brokers to protect *both importers and the revenue of the United States.* 19 U.S.C. § 1641(d) reads as follows:

19 U.S.C. § 1641 Customhouse brokers

(d) **Regulations by Secretary.** The Secretary of the Treasury *shall* prescribe such rules and regulations *as he may deem necessary to protect importers and the revenue of the United States,* and to carry out the provisions of this section, including rules and regulations requiring the keeping of books, accounts, and records by customhouse brokers, and

---

**2.** For example, Check No. 43896 dated March 7, 1980, was not paid until April 21, 1980; Check No. 44314 dated April 15, 1980, was not paid until May 5, 1980.

the inspection thereof, and of their papers, documents, and correspondence by, and the furnishing by them of information relating to their business to, any duly accredited agent of the United States. [emphasis supplied]

This Court deems the word "shall" contained within 19 U.S.C. § 1641(d) to be imperative in nature. Although Congress gave the Secretary certain discretion in how he promulgates regulations concerning the relationship between brokers, importers and the revenue of the United States, this Court finds that the Secretary *must*, when promulgating such regulations, adhere to Congress's directive that these regulations protect *both* the importers and the revenue of the United States.

If there remained any doubt as to why Congress used the word "shall" in 19 U.S.C. § 1641(d), the legislative history of the 1935 amendment to 19 U.S.C. § 1641(d) that added the language "to protect importers," makes it clear that Congress intended that the word "shall" be given its common imperative meaning. The overwhelming impact of this legislative history justifies the following extended quotation:

> While the large importers are more or less familiar with customs procedure the great majority of importers are solely dependent upon the honesty and the competency of their customs brokers to protect their interests. Even in the case of large importers, however, due to the specialized nature of customs procedure, great reliance must be placed upon their brokers for proper entry of merchandise.
>
> In view of the fact that these customhouse brokers are quasi officers of the Treasury and that by licensing them the Treasury holds out to importers that it has investigated their character and represents to such importers that they are capable and honest in their conduct of their customs business, and in view of

the large opportunities for profitable fraud open to dishonest persons who, from the very nature of things, occasionally succeed in obtaining licenses as customhouse brokers despite the strictest possible investigation by the Treasury of their character and qualifications, it is essential that the Department have wide discretion in dealing with these brokers and that the Secretary of the Treasury, therefore, be given broad powers to supervise and regulate their activities. Under existing law his powers in these respects are very limited, and it is the purpose of the present amendments to broaden the Secretary's powers so that he can in the future more effectively cope with frauds practiced by customhouse brokers on both importers and the revenues of the United States.

> Although the great majority of these brokers are entirely above reproach in the conduct of their business, the corrupt practices of a few, unhampered by adequate statutory provisions for supervision, have proved a grave menace to importers and customs revenue alike. The present amendments are designed to remedy this situation. They will give to the Secretary of the Treasury the power to regulate the conduct of the business of customhouse brokers in such a manner that *the opportunity for fraudulent practices will be reduced to an absolute minimum.* [emphasis supplied]

S.Rep. No. 1170, 74th Cong., 1st Sess., 3 (1935).

It is thus clear that Congress was extremely concerned with the victimization of importers by brokers and required that the Secretary prescribe regulations protecting both importers and the revenue of the United States from possible frauds by brokers.

■ 19 U.S.C. § 1648 [3] granted the Customs Service broad authority to promul-

---

3. **§ 1648. Uncertified checks, United States notes, and national bank notes receivable for customs duties.**

Customs officers may receive uncertified checks, United States notes, and circulating notes of national banking associations in pay-

ment of duties on imports, during such time and under such rules and regulations as the Secretary of the Treasury shall prescribe; *but if a check so received is not paid the person by whom such check has been tendered shall remain liable* for the payment of the duties and

gate regulations regarding the payment of Customs duties with uncertified checks. *See* 19 C.F.R. § 24.1(3). However, when the Customs Service agrees to accept an uncertified check from a broker pursuant to any regulation it promulgates under 19 U.S.C. § 1648, such regulation and the Customs Service's interpretation of this regulation, must conform to clear Congressional intent contained within 19 U.S.C. § 1641(d).[1]

■ The regulation contained in 19 C.F.R. § 24.1(3) cannot operate to the detriment of importers entrusting their funds to brokers, without violating 19 U.S.C. § 1641(d). A regulation such as this one that authorizes the government to accept an uncertified check from a broker cannot be exclusively used for the protection of the revenue of the United States at the unwitting expense of the importer, without failing to fully effectuate 19 U.S.C. § 1641(d) and its clear legislative purpose. It would be palpably absurd to have the importer guarantee the conduct of its broker when the clear intent of 19 U.S.C. § 1641(d) was to protect *both* the revenue of the United States and the *importer* from possible misconduct by brokers.

■ It is inconceivable that the sum at issue would not be safely within the hands of the government, had it complied with its own regulation. The regulation in question, 19 C.F.R. § 24.1(3), must be interpreted so that it comports with the law, in which case, the bond posted *must* be the bond of the party making payment. Any interpretation of this regulation which would allow the bond of the importer to protect the legal obligation of the broker is unlawful.

■ This Court also takes note of another regulation promulgated pursuant to 19 U.S.C. § 1641 which also must protect

*both* the importer and the revenue of the United States.

19 C.F.R. § 111.27 states:

The · Regional Director ... *shall* make such audit or inspection of the books and papers to be required to be kept and maintained by a broker as may be necessary ... *to determine* whether or not the broker is complying with the requirements of this part. Furthermore the Regional Director ... may inspect such books and papers to obtain information regarding specific Customs transactions for the purpose of *protecting importers* or the revenue of the United States. [emphasis supplied]

The Regional Director must conduct audits in a manner designed to protect both importers and the revenue of the United States. This Court cannot permit the plaintiff to benefit from its own violation of the law nor can it condone the Custom Service's failure to conform to its own regulations. By continuing to redeposit Loudon's "bouncing checks" in early 1980, the government was directly responsible for endangering the payment of duties by Cometals. At the same time, the government was not enforcing a law intended to protect *both* importers and the revenue of the United States.

■ The government's failure to act in accordance with 19 C.F.R. § 24.1(3) and its violation of the manifest intention of Congress would be sufficient by itself to estop it from obtaining the duties in question. Moreover, by the loose enforcement of 19 C.F.R. § 111.27 and by failing to follow up its September, 1977, audit of Loudon, the government was increasing its risk and the risk of importers who were entrusting their funds to the broker. This Court holds that under the facts presented the government has committed affirmative misconduct and further holds that it is equitably estopped

for all legal penalties and additions to the same extent as if such check had not been tendered. [emphasis supplied]

**4.** The statute also expressly states that "[i]f a check so received is not paid *the person by*

*whom such check has been tendered* shall remain liable for the payment of the duties...." *See* 19 U.S.C. § 1648. [emphasis supplied]

from recovering the import duties in question.

## II

■ Equitable estoppel adjusts the relative rights of parties based upon a consideration of justice and good conscience. *United States v. Georgia-Pacific Company*, 421 F.2d 92, 95 (9th Cir.1970) (and cases cited therein). It has been stated that equitable estoppel precludes a party both at law and equity "[f]rom asserting rights which might perhaps have otherwise existed either of property, of contract, or of remedy as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract or of remedy." 3 Pomeroy, Equity Jurisprudence § 804 at 189 (5th ed. Symons 1941).

■ Generally, in suits not involving the government, four elements must be present in order to establish the defense of estoppel: (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts and (4) he must rely on the former's conduct to his injury, *United States v. Ruby Co.*, 588 F.2d 697, 703 (9th Cir.1978).

The traditional elements of estoppel are clearly present in the instant action. The government knew about Loudon's precarious financial condition and improperly relied upon Cometal's bond when it accepted Loudon's uncertified checks. The defendants were not aware of Loudon's precarious financial condition, nor did they know that the government was relying on them as guarantors of Loudon's "bouncing" checks. The government's mechanism for collecting duties is in its nature intended to encourage reliance on its regularity and propriety by those owing duties. As a

result of reliance on the propriety of the government's conduct, Cometals lost $230,-344.12. The government's failure to adhere to its own regulations and to act in accordance with the law provides the crucial element of affirmative misconduct that is necessary to estop the government.

The Court in *Corniel Rodriguez v. I.N.S.*, 532 F.2d 301 (2nd Cir.1976) held that: "[n]on compliance with an affirmatively required procedure, obviously designed to protect individuals ... (is) an act of *affirmative misconduct*.... Indeed since 22 C.F.R. § 42.122(d) was validly adopted ... it carries the force of law (and) must be respected and enforced by the Government." *Corniel Rodriguez v. I.N.S.*, 532 F.2d, at 306, 307 (1976) (and cases cited therein). [emphasis supplied]

■ The presence of an additional element of affirmative misconduct must be established in order for the government to be subject to equitable estoppel. This additional element is necessary because the government cannot be estopped under the same terms as a private litigant:

[W]hen the government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interests of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the government may not be estopped on the same terms as any other litigant. *Heckler v. Community Health Services of Crawford*, ── U.S. ──, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984).

This Court must take note however, that failing to estop the government when it has breached the law would encourage disobedience of the law by the government as well as private citizens.

■ It has also been said that the government cannot be estopped under the same conditions as a private party because of the government's responsibility to protect the public interest.[5] "As a general

---

5. The sovereign's duty to protect the public interest is subsumed within the doctrine of sover-

eign immunity. However the scope of sovereign immunity and the degree to which it has

rule, laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to *enforce a public right or protect a public interest....*" *Utah Power and Light Co. v. United States*, at 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917) [emphasis supplied].

In the instant case the public interest required to be protected consisted of both the revenue of the United States and *importers.* The plaintiff here failed to comply with the law and ignored the public interest by not protecting *both* importers *and* the revenue of the United States. The reasons for limiting the application of equitable estoppel against the government certainly cannot justify the plaintiff's failure to act in accordance with the law in a matter of the utmost importance.

It must be acknowledged that the opinion in *Air Sea Brokers v. United States*, 66 C.C.P.A. 64, C.A.D. 1222, 596 F.2d 1008 (1979) held that equitable estoppel is not available in cases involving the collection of duties on imports. The conduct complained of in *Air Sea Brokers* however, did not involve the breach of a regulation or a statute. In *Air Sea Brokers*, the alleged misconduct consisted of the filling out of forms by the government which might have allowed a broker to achieve duty free entry without certain documents. This conduct was counterbalanced by an ambiguous stamp on the form and more importantly, actual knowledge by the broker that the Custom Service was not waiving the documentary requirement.

Thus, the government's conduct in *Air Sea Brokers* was milder and more ambiguous than the conduct involved in this case. In the instant case there is no possible ambiguity in what the government did and no ameliorating factors in justifying its dereliction of duty. Here, the conduct of the government directly contravened two basic purposes of the law; the protection of the revenue of the United States and the

protection of importers. Also of significance is that in the instant action, the defendants justifiably relied on the government's conformance with the law, while in *Air Sea Brokers*, the broker had actual knowledge of the government's conduct. The opinion in *Air Sea Brokers* does not sanction *all* possible government misconduct in the area of duty collection, particularly when it displays a blatant disregard for the public interest in a matter of the utmost importance.

■ Moreover, for the government to be immune from the defense of equitable estoppel it must be acting for the benefit of the public. *See Utah Power and Light v. United States, supra.* Thus, in *Federal Crop Insurance v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) a farmer who had planted wheat relying on the advice of an agent of the Federal Crop Insurance Corp. (FCIC) that it was insured under its program could not recover for the loss of his crop, because the regulation of the FCIC precluded coverage for spring wheat which had been reseeded on winter wheat acreage. To permit the farmer to recover in *Federal* would undermine a fundamental public policy.

In the instant case it is affirmative *government conduct* not the representation of a mere government agent that has contravened the government's own regulations as well as the express intent of Congress. Here, it is the government that has acted in opposition to the public interest, by violating its duty to protect both importers and its own revenue. The government has given a higher priority to a display of leniency to a broker, the one party under the facts presented whose role is least identifiable with the public interest. The violation of the government's duty to protect importers as well as the revenue of the United States cannot be sanctioned by this Court.

---

insulated the government has been narrowed considerably. The doctrine of sovereign immunity and its corollary the governmental-proprietary distinction has been criticized and narrowed. See *United States v. Georgia Pacific Co.,*

421 F.2d 92, 99. *See also Garcia v. San Antonio Metropolitan Transit Authority,* — U.S. —, —--—, 105 S.Ct. 1005, 1009–1017, 83 L.Ed.2d — (1985).

In *I.N.S. v. Miranda*, 459 U.S. 14, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) an 18-month delay in considering an immigration application did not amount to affirmative misconduct. In *I.N.S.* however, no regulation or statute was violated by the government and there was also justification for the administrative delay.

In *Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) incorrect advice given by a field representative of the Social Security Administration did not amount to affirmative misconduct. Most revealingly, the Supreme Court stated in *Schweiker* that "[a]t most, Connelly's [the government's] conduct *did not cause respondent to take action ... or fail to take action, ...* that respondent could not correct at any time." (Citations omitted) *Id.* at 789, 101 S.Ct. at 1471 [emphasis supplied]. Furthermore, the Supreme Court emphasized that the field representative's neglect only violated *the agency's claims manual and not a regulation. See Schweiker v. Hansen*, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685. The contrast with the facts of this case could hardly be more striking, in that here the importer was irreparably injured as a result of an obvious disregard by the government of its own regulations and a statute.

The loss of revenue here is directly attributable to the government's failure to act in accordance with its own regulations and in accordance with a clear Congressional mandate. In this case the plaintiff has not acted in behalf of the public interest and thus has no right to resist the just effect of equitable estoppel.

In conclusion, this Court holds that the government's failure to act in accordance with the law equitably estops it from obtaining the duties in question. The defendants' claims, for equitable recoupment as well as the government's obligation to the surety are not reached in this opinion because this action is resolved on more fundamental grounds.

### JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein, now, in conformity with said decision,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED:

That plaintiff's motion for summary judgment is DENIED; and it is further

ORDERED that defendant's motion for summary judgment is GRANTED.