UNITED STATES, Appellant,

v.

**FEDERAL INSURANCE COMPANY**
**and Cometals, Inc., Appellees.**

**Appeal No. 85–2343.**

United States Court of Appeals,
Federal Circuit.

Nov. 10, 1986.

Barbara M. Epstein, Commercial Litigation Branch, Dept. of Justice, New York City, argued, for appellant; with her on the brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office.

David Serko, Serko, Simon & Abbey, New York City, argued, for appellees.

Before MARKEY, Chief Judge, NIES and NEWMAN, Circuit Judges.

NIES, Circuit Judge.

The United States appeals the judgment of the United States Court of International Trade in *United States v. Federal Insurance Co. and Cometals, Inc.*, 605 F.Supp. 298 (Ct. Int'l Trade 1985), holding that the government is equitably estopped from collecting certain import duties from an importer, Cometals, Inc., and its surety, Federal Insurance Company. Our jurisdiction over the appeal is found in 28 U.S.C. § 1295(a)(5). We reverse and remand with the direction to enter judgment for the government.

I.

This appeal raises the question of whether the government or an importer bears the risk of non-payment of import duties by a licensed broker who fails to pay over monies the broker received from the importer for payment of duties. On a theory of equitable estoppel the Court of International Trade placed the risk on the government. We disagree. In sum, we reaffirm that a licensed broker is the agent of the importer, not of the government, and that no equitable estoppel can arise against the government in connection with an obligation to pay taxes. We further hold that, in any event, no basis for equitable estoppel exists in this case. Contrary to the trial court's holding, the government violated neither statute nor regulation in accepting an uncertified check from a broker

which was secured by a bond given by the importer. The importer and his surety remain liable for duties owed to the government regardless of the malfeasance or misfeasance of a broker. Where the government is aware that a broker is in a precarious financial condition or has mishandled the affairs of importers, the government is obliged to investigate and, in appropriate circumstances, to suspend or revoke the license of such broker. However, the statutory provision regarding supervision of brokers for the protection of importers in *general* creates no right in an *individual* importer to be relieved of his outstanding tax obligations, indeed, is irrelevant to his continued liability.

■ Thus, the Court of International Trade erred, as a matter of law, in holding that the government was equitably estopped from collecting from the importer and its surety the duties owed to the public fisc.

## II.

The United States, plaintiff below, brought suit in the United States Court of International Trade to recover unpaid liquidated import duties in the amount of $230,-344.12, plus interest, against the importer, Cometals, Inc., and its surety on a bond, Federal Insurance Company.

On May 7, 1980, an entry had been filed at the Port of Los Angeles, California, showing Cometals as importer of record of 715 drums of titanium sponge being exported from China by Japan. This entry had been made on behalf of Cometals by its customhouse broker, James Loudon & Co., Inc., which has since declared bankruptcy.

In connection with this entry, Cometals and Federal Insurance Co. had executed and delivered a general term bond to the Customs Service. Because the bond guaranteed payment of the duties, the imported merchandise was released to Cometals on the date entry was made, prior to the payment of duties. Cometals had, however, wired the amount of the import duties to Loudon's account on or about May 2, 1980. Loudon issued its own uncertified check in the amount of the estimated duties to the Customs Service on May 12, 1980.

The Customs Service accepted Loudon's uncertified check, asserting in this suit that acceptance of that check was required under Customs Regulation 19 C.F.R. § 24.-1(3), which states that "an uncertified check drawn by an interested party ... shall be accepted if there is on file ... an entry bond or other bond to secure the payment of duties...." [1]

When Loudon's check was not honored by its bank because of insufficient funds, the Customs Service obtained a second check from Loudon. However, this check was also not paid by the bank. After further attempts to secure payment from Loudon, the Customs Service then turned to the importer and its surety for payment. Upon their refusal, the government instituted suit to collect the unpaid import duties from these parties. In response to the government's complaint, Cometals and its surety asserted "equitable estoppel" as an affirmative defense, as well as a number of counterclaims against the government.[2] Ruling on cross-motions for summary judgment, the trial court denied the government's motion and granted appellees' motion, holding that the United States

---

**1.** 19 C.F.R. § 24.1(3) reads in pertinent part as follows:

§ 24.1 Collection of customs duties, taxes, and other charges.

\* \* \* \* \* \*

(3) An uncertified check drawn by an interested party on a national or state bank or trust company of the United States or a bank in Puerto Rico or any possession of the United States if such checks are acceptable for deposit by a Federal Reserve bank, branch Federal Reserve bank, or other designated depositary shall be accepted if there is on file with the district director an entry bond or other bond to secure the payment of the duties, taxes, or other charges....

**2.** All of the counterclaims were dismissed for lack of jurisdiction with the exception of a claim for "equitable recoupment" which the court did not find necessary to decide in view of its upholding the defense of equitable estoppel. This counterclaim fails, *inter alia,* for the same reason as the defense of estoppel.

was equitably estopped from recovering on its claim. 605 F.Supp. at 299.

The Court of International Trade based its holding essentially on the following determinations:

(1) As a matter of law, the United States can be equitably estopped from recovering import duties if it commits affirmative misconduct.

(2) The government committed affirmative misconduct in this case by accepting an uncertified check from a customhouse broker which was secured by the bond of the importer. Customs Regulation 19 C.F.R. § 24.1(3), which requires acceptance of an uncertified check which is secured by a bond, must be interpreted to require that the customhouse broker file its own bond to secure payment of the broker's uncertified check. The interpretation by the Customs Service of 19 C.F.R. § 24.1(3) is contrary (per the court) to congressional intent and to three statutory provisions: 19 U.S.C. § 66 (regulations must be consistent with law), 19 U.S.C. § 1641(d) (Secretary shall prescribe regulations for the licensing of brokers as he may deem necessary to protect importers and the revenue of the United States), and 19 U.S.C. § 1648 (Secretary shall prescribe regulations for receiving uncertified checks in payment of duties).

(3) The government also committed affirmative misconduct by the "loose enforcement of 19 C.F.R. § 111.27," with respect to auditing of brokers, and by not following up on a 1977 audit of Loudon, which showed a "severe net worth deficiency."

The trial court noted in connection with the last point that Loudon's September 1977 financial statement, obtained as a result of an audit, showed that Loudon's liabilities exceeded its assets by over $164,000.00 and that Loudon had been responsible for more than $190,000.00 in overdrafts. In late 1979 and early 1980, six of Loudon's checks covering Cometals' entries were originally not paid by Loudon's bank because of insufficient funds, but all except the last, which was for the duties of this case, were paid on resubmission. Despite these warning signs since 1977, the government made no further audit of Loudon. It continued to accept Loudon's uncertified checks where the duties were guaranteed by a bond.

The trial court concluded that, in its view, the government "disregarded its own regulations, interpreted a decisive regulation unlawfully, and disregarded the manifest intention of Congress" and, thus, was equitably estopped from recovery on its claim. 605 F.Supp. at 299. The court acknowledged that "the opinion in *Air-Sea Brokers v. United States*, 66 C.C.P.A. 64, C.A.D. 1222, 596 F.2d 1008 (1979) held that equitable estoppel is not available in cases involving the collection of duties on imports." It distinguished *Air-Sea Brokers* from this case on the ground that the earlier decision did not involve the agency's breach of a regulation or statute, as did the case at hand, but rather "milder and more ambiguous" conduct by government employees. *Id.* at 304. The court also noted the decision of the Supreme Court in *Heckler v. Community Health Services of Crawford*, 467 U.S. 51, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984), which implies that the government could be estopped although on a more stringent standard than a private litigant.

Relying on the violations it perceived, the court opined that the reasons for generally denying estoppel against the government could not justify the government's misconduct in failing to protect the importer and the public revenue. Thus, the suit by the government was not in the public interest. To uphold the government would encourage the government in its disobedience of the law. Under these circumstances, the government had "no right to resist the just effect of equitable estoppel." *Id.* at 305.

## III.

In *Air-Sea Brokers*, the Court of Customs and Patent Appeals, a predecessor of this court whose decisions are binding precedent (*South Corp. v. United States*,

690 F.2d 1368, 1370–71, 215 USPQ 657, 657–58 (1982)), held without equivocation:

> Accordingly, we hold that equitable estoppel, even if available in cases involving the Government in its proprietary capacity, is not available against the Government in cases involving the collection or refund of duties on imports.

596 F.2d at 1011. In reaching its decision, our predecessor relied on *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 183, 77 S.Ct. 707, 709, 1 L.Ed.2d 746 (1957) in which the Supreme Court stated, in connection with a tax claim, that "[t]he doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law."

Contrary to the analysis of the trial court, the decision in *Air-Sea Brokers* was not dependent on the "milder and more ambiguous" nature of the conduct of a particular government employee in contrast to the breach of the statute or regulation by the Secretary's wrongful interpretation of his authority. The case holds broadly that no estoppel can arise against the sovereign act of tax collection and has been relied on and applied in other custom duties cases, *e.g.*, *United States v. Reliable Chemical Co.*, 605 F.2d 1179, 1184 (CCPA 1979). Even if this panel disagreed with that tenet, it is powerless to overturn it.

Nor are we inclined to recommend reconsideration of settled law by this court *in banc* in this case. If we assume that an equitable estoppel might be found in extraordinary circumstances, the holding by the trial court on equitable estoppel is based on an erroneous interpretation of the statute and regulations. There is no "illegal" conduct by the agency on which to predicate an estoppel in this case.

The trial court held that 19 C.F.R. § 24.1(3) (*supra*, note 1) must be interpreted to require that an uncertified check of a broker shall be accepted only if a bond has been posted *by the broker*. In the words of the trial court:

> The regulation in question, 19 C.F.R. § 24.1(3), must be interpreted so that it comports with the law, in which case, the bond posted *must* be the bond of the party making payment. Any interpretation of this regulation which would allow the bond of the importer to protect the legal obligation of the broker is unlawful.

605 F.Supp. at 302.

Only if the broker posts the bond, per the court, have the interests of the importer and the public revenue been protected as required by 19 U.S.C. § 1641(d). The Secretary, on the other hand, has taken the position, since at least 1955, that the government must accept an uncertified check if the bond *of any interested party* is posted covering the payment of the duties for which the check is tendered. As stated in the explanation of the amendment to section 24.1(3) which changed the language of the regulation to that which is under consideration:

> Section 24.1(3) now contains a provision that an uncertified check which can be cashed without expense to the Government shall be accepted by the collector of customs in payment of duties and other charges if drawn and tendered by a business or other organization, or by an individual, "who has on file with the collector of customs a customs entry bond or other bond to secure the payment of such duties or other charges." *It is [sic, was] not intended that this provision be interpreted as requiring that the drawer of the check and the principal on the bond shall necessarily be the same person or organization, and it is deemed desirable to clarify the regulation on this point.*

20 Fed.Reg. 8,775 (1955).

Thus, the interpretation which the trial court finds clearly illegal and contrary to congressional intent is one explicitly announced and consistently applied for more than 30 years.

We have no record here from which we might learn the advantages, as opposed to the disadvantages, to importers in having an importer—as opposed to his broker—post the bond. However, since no importer has previously challenged the govern-

ment's interpretation, despite hundreds of thousands of entries, we can only surmise that the government's interpretation is not wholly unsatisfactory to the importing community. Nor has Congress undertaken to overrule the Secretary's interpretation despite numerous opportunities since 1955. "[C]ongressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974).

The foregoing historical facts were not taken into consideration by the trial court in holding that the Secretary's interpretation of 19 C.F.R. § 24.1(3) was illegal. The function of a court is not, of course, to determine in this type of situation whether the Secretary's interpretation is the only possible interpretation of the statute, *Chemical Manufacturers Assoc. v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985), but to determine whether the Secretary's interpretation is reasonable. As held in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984), "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Given the Secretary's long-standing and consistent interpretation, a court must be particularly circumspect in substituting its view of the statute for that of the agency charged with the responsibility for its administration. *See Young v. Community Nutrition Institute,* — U.S. —, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986).

In holding that the Customs Service violated the statute in accepting an uncertified check of the broker not backed by the broker's own bond, as indicated, the trial court relied on three statutory provisions, which the court held were in *pari materia,* each of which grants the Secretary authority to issue certain regulations: 19 U.S.C. § 66, 19 U.S.C. § 1641(d) and 19 U.S.C. § 1648. Each of these provisions must be examined in turn.

### Section 66

Section 66 is of no significance to the issue of whether the Secretary's interpretation of section 24.1(3) is legal or illegal. Section 66 provides simply that the Secretary shall prescribe rules and regulations with respect to import duties not inconsistent with law.[3]

### Section 1641

Section 1641 deals with the licensing of brokers. It provides, *inter alia,* that no one may act as a customhouse broker without a license, and for the Secretary to prescribe rules and regulations governing their licensing. Section 1641(b), which authorizes revocation or suspension of a broker's license upon notice, and a due process hearing, provides:

> [After notice and a hearing] the said Secretary of the Treasury shall have the right to revoke or suspend the license of any customhouse broker shown to be incompetent, disreputable, or who has refused to comply with the rules and regulations issued under this section, or who has, with intent to defraud, in any manner willfully and knowingly deceived, misled or threatened any importer, exporter, claimant or client, ... by word, circular, letter or by advertisement.

Section 1641(d), which the trial court found was violated by the Secretary's interpretation of his regulation, reads as follows:

> (d) Regulations by Secretary. The Secretary of the Treasury *shall prescribe such rules and regulations as he may deem necessary to protect importers*

---

**3.** 19 U.S.C. § 66 provides:
The Secretary of the Treasury shall prescribe forms of entries, oaths, bonds, and other papers, and rules and regulations not inconsistent with law, to be used in carrying out the provisions of law relating to raising revenue

from imports, or to duties on imports, or to warehousing, and shall give such directions to customs officers and prescribe such rules and forms to be observed by them as may be necessary for the proper execution of the law.

*and the revenue of the United States,* and to carry out the provisions of this section, including rules and regulations requiring the keeping of books, accounts, and records by customhouse brokers, and the inspection thereof, and of their papers, documents, and correspondence by, and the furnishing by them of information relating to their business to, any duly accredited agent of the United States. (Emphasis added.)

In connection with enacting the comprehensive plan of section 1641 to regulate brokers, the legislative history contains the following expression of congressional intent:

Although the great majority of these brokers are entirely above reproach in the conduct of their business, the corrupt practices of a few, unhampered by adequate statutory provisions for supervision, have proved a grave menace to importers and customs revenue alike. The present amendments are designed to remedy this situation. They will give to the Secretary of the Treasury the power to regulate the conduct of the business of customhouse brokers in such a manner that the opportunity for fraudulent practices will be reduced to an absolute minimum.

S. Rep. No. 1170, 74th Cong., 1st Sess. 3 (1935).

### Section 1648

Section 1648 is not directed to brokers but rather deals with the subject of methods of payment of duties. In contrast to the authority of the Secretary in connection with other types of tax obligations, Congress has never allowed the Secretary to accept uncertified checks tendered in payment of import duties except under certain conditions. Section 1648 was enacted to liberalize the Secretary's authority, which had been more rigidly circumscribed, and reads in its entirety:

Customs officers may receive uncertified checks, United States notes, and circulating notes of national banking associations in payment of duties on imports, during such time and under such rules and regulations as the Secretary of the Treasury shall prescribe but if a check so received is not paid the person by whom such check has been tendered shall remain liable for the payment of the duties and for all legal penalties and additions to the same extent as if such check had not been tendered.

The trial court held that the above authority of the Secretary with respect to regulating methods of payment was restricted by the requirement of section 1641, with respect to licensing brokers, that the Secretary *shall* issue regulations which protect importers. The mandatory language *"shall"* in section 1641(d) was controlling, per the trial court, with respect to the regulations under section 1648, and made the Secretary's interpretation of 19 C.F.R. § 24.1(3) issued under section 1648 illegal. We disagree that the Secretary's authority under section 1648 is so circumscribed.

While the trial court correctly noted the words of section 1648(d) that the Secretary shall prescribe regulations to protect the importer, the court failed to take into account that the Secretary has been given wide discretion in deciding the scope of such regulations. Congress did not direct that the regulations must protect importers from all improvident or malicious acts of brokers. Rather it provided that the Secretary shall prescribe such regulations "as he may deem necessary to protect importers and the revenue of the United States." The words "as he may deem necessary" indicate that Congress intended to restrict judicial interference with the Secretary's exercise of his power. *See Young v. Community Nutrition Institute,* 106 S.Ct. at 2364–65.

■ The trial court also misconstrued the Congressional intent expressed in section 1641. Section 1641, in its entirety, does not require that the Secretary protect each importer from a particular financial loss or injury by a particular broker. Sec-

tion 1641 contemplates the withdrawal of licenses only *after* misconduct.[4]

■ Section 1641 imposes no obligation on the government to advise all importers or any particular importer that a particular broker is in a possibly shaky financial condition. Either a broker is licensed or he is not.[5]

■ As indicated in the legislative history, these statutory provisions are designed to protect the importing community by giving the Secretary the power to regulate the conduct of brokers and to reduce, thereby, the possibility of fraud to a minimum. The government, by granting a license and by having the power to withdraw that privilege, is not obligated to become the guarantor of each transaction conducted by a broker. Nothing in the legislative history leads to a contrary conclusion. Nor must the Secretary provide in 19 C.F.R. § 24.1(3) that the broker must post his own bond for his uncertified check. Such a requirement would conflict with the flexible authority intended to be conferred by 19 U.S.C. § 1648.

The trial court mistakenly found support for its view in the following language of section 1648, "[I]f [an uncertified] check so received is not paid the person by whom such check has been tendered shall remain liable for the payment of the duties...." The trial court reasoned that since the broker tendered the check, the broker remained liable and therefore, the broker's bond had to be on file to meet his obligation. The court erred, however, in its understanding of the meaning of this provision. The provision that the person tendering the check "shall remain liable" has no applicability to the broker. The broker was *never* liable to the government for the duties. Thus, under section 1648, the broker cannot "remain" liable for duties for which it was never liable.

The trial court also incorrectly concluded that if the regulation did not require that the bond be that of the broker, it "would allow the bond of the importer to protect the legal obligation of the broker...." This analysis is backwards. It is the importer who has the legal obligation to the government to pay the duties, and the bond protects the legal obligation of the importer.[6] The trial court confused obligations between the broker and the importer with obligations of the importer to the government.

4. Cometals argues that its broker, Loudon, was initially or became the agent of the government, and that Cometals' payment to the broker, therefore, constituted payment to the government. The theory that a broker is an agent of the government because the broker may operate only after obtaining a government license is again rejected. *See E.H. Corrigan v. United States*, 35 CCPA 10 (1947). The broker licensing program is designed to provide a substantial measure of protection to the public with whom brokers deal. But a broker is in a position no different from any other professional or skilled person who may legally operate only under a government license, for example, a registered patent attorney. The grant of such license represents to the public simply that certain minimum requirements necessary to practice their profession have been shown to be satisfied. It does not constitute a representation by the government that the broker will on all occasions properly handle the business of a client. Nor does misconduct somehow convert the broker to the agent of the government.

5. It is inconceivable to the majority that the government could be held under an obligation to warn importers away from a broker who is licensed, or may publicly disclose a broker's financial condition. Section 1641(b) is designed to provide a large measure of protection for brokers. The suggestion that the government must warn prospective clients against a broker would circumvent these safeguards and must be unequivocally rejected.

6. This premise is clearly supported by 19 C.F.R. § 141.1(b) (1980) which states:

(b) Personal debt of importer. The liability for duties, both regular and additional, attaching on importation constitutes a personal debt due from the importer to the United States which can be discharged only by payment in full of all duties legally accruing, unless relieved by law or regulation. It may be enforced notwithstanding the fact that an erroneous construction of law or regulation may have enabled the importer to pass his goods through the customhouse without such payment.

*See also Meredith v. United States*, 38 U.S. (13 Pet.) 486, 493, 10 L.Ed. 258 (1839) (import duties constitute a personal debt due to the United States from the importer).

In view of the above considerations, we hold that the Secretary's interpretation of 19 C.F.R. § 24.1(3) is reasonable and that acceptance of Loudon's uncertified check in reliance on Cometals' bond was not a violation of the statute or the regulation.[7]

The basis for the trial court's holding on equitable estoppel being erroneous as a matter of law, the judgment cannot stand.

## IV.

For the foregoing reasons, the judgment of the Court of International Trade holding that the government is equitably estopped from collecting duties owed by the importer Cometals and its surety is reversed. The case is remanded for entry of a judgment on liability in favor of the government and such further proceedings as are consistent with this opinion.

REVERSED AND REMANDED.

PAULINE NEWMAN, Circuit Judge, dissenting.

I respectfully dissent.

In this case of neglect of duty by government agents in administering a statute enacted for the purpose of protecting importers and the United States against the notorious potential for abuse by customhouse brokers, the trial court had sound basis for invoking the doctrine of equitable estoppel. The majority's opinion pays scant deference to the facts as found by the Court of International Trade, none of which the majority finds to be clearly erroneous.

Appellate review of an equitable judgment requires not only attention to the specific abuses that led the court to impose an equitable remedy; but more, it requires appropriate deference to the discretionary authority with which trial judges are invested. Trial courts "in the framing of equitable decrees, are clothed 'with large discretion to model their judgments to fit the exigencies of the particular case.'" *United States v. E.I. du Pont de Nemours*

*& Co.*, 353 U.S. 586, 607–08, 77 S.Ct. 872, 885, 1 L.Ed.2d 1057 (1956) (quoting *International Salt Co. v. United States*, 332 U.S. 392, 400–01, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947)). *See also Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 10, 100 S.Ct. 1460, 1466, 64 L.Ed.2d 1 (1980) ("the discretionary judgment of the district court should be given substantial deference"). The basis for our review of the decision of the Court of International Trade is whether the court abused its discretion in imposing equitable estoppel, on the uncontested facts of this case. See *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) in which, in directing the Fourth Circuit as to the standard to apply to the district court's determination of whether respondents were entitled to the equitable remedy of backpay, the Supreme Court stated:

> [T]he standard of review will be a familiar one of whether the District Court was "clearly erroneous" in its factual findings and whether it "abused" its traditional discretion to locate "a just result" in light of the circumstances peculiar to the case....

*See also Los Angeles Department of Water & Power v. Manhart*, 435 U.S. 702, 729, 98 S.Ct. 1370, 1386, 55 L.Ed.2d 657 (1978) (Marshall, J., concurring in part and dissenting in part).

A trial court's exercise of equitable discretion based on specific circumstances is the acme of the judicial obligation to do justice under law. It is not defeasible by generalities as to the absolute right of the sovereign to extract monies from citizens—a right that is not absolute, as this nation declared in 1776. The government is subject to minimal standards of responsibility in dealing with the public, whether the matter at issue is customs duties or any other impost on the public.

In holding the United States estopped, the trial court, expert in customs law, invoked the policy behind the law that the

---

**7.** The artificiality of this entire analysis based on 19 C.F.R. § 24.1(3) is illustrated by the fact it can be raised in this case only because the broker issued his check. If the broker had not done so, the foundation for the argument simply disappears.

government had failed to administer. The trial court declined to excuse the government from the consequences of this failure. Viewed another way, the trial court refused to penalize the innocent importer by requiring the importer to pay the duty of $230,334.12 twice, when governmental lapse was a significant factor in the event.

The trial court recognized, as had Congress when the current law controlling customs brokers was enacted, the unusual role of customhouse brokers in the customs business:

> [I]n view of the fact that these customhouse brokers are quasi-officers of the Treasury and that by licensing them the Treasury holds out to importers that it has investigated their character and represents to such importers that they are capable and honest in their conduct of their customs business....

Cong.Rec. 13,356–57 (1935) (statement of Senator Walsh). *See also* S.Rep. No. 1170, 74th Cong., 1st Sess. 3 (1935).

As the trial court remarked, Loudon's history of bad checks and negative net worth was well known to the Customs Service. The legislative history shows that the regulation of customs brokers was designed to protect "both importers and the revenue of the United States". Cong.Rec. 13,387 (1935). Congressman Crowther reiterated that customs brokers are

> pseudo Federal officers in the sense that they handle the customs revenue as between the Government and the importer
> ...

Cong.Rec. 14,577 (1935), and that in light of their "peculiar relation" to the federal government, the Treasury Department

> ought to have complete authority for a thorough examination of their transactions in order to end this racketeering and depleting of the revenue of the Government of the United States.

*Id.* This authority was enacted by statute:

### Regulations by Secretary

The Secretary of the Treasury shall prescribe such rules and regulations as he may deem necessary *to protect import-ers and the revenue of the United States,* and to carry out the provisions of this section, including rules and regulations requiring the keeping of books, accounts, and records by customhouse brokers, and the inspection thereof.... [Emphasis added]

19 U.S.C. § 1641(d).

Pursuant to this authority the Treasury examined Loudon's finances. A government audit in October 1977 revealed that Loudon's liabilities exceeded his assets by over $164,000, and that he was responsible for more than $190,000 in overdrafts. This in itself violated the standards for licensed brokers. In late 1979 and early 1980 six of Loudon's uncertified checks, some covering Cometals' entries, were dishonored and returned to the Customs Service on the basis of insufficient funds. The Customs Service never advised the importer of these events. Although Loudon eventually covered these checks, the government's blind eye to Loudon's style was inimical to its statutory responsibility.

Despite its knowledge of Loudon's negative net worth and its experiences with Loudon's bad checks, the Customs Service conducted no audit after 1977 of Loudon's financial condition, took no action in connection with Loudon's license, required no bond from Loudon, and did not tell the importer when its broker's checks were dishonored. Nothing whatsoever was done to protect either the importer or the United States, as required by statute. The trial court held that the government was equitably estopped, by these actions, from recourse against Cometals in this case.

Despite long-standing congressional and judicial recognition of the pragmatic role of customhouse brokers as "quasi-officers of the Treasury", the majority erases this history by its fiat that Loudon was a "mere agent" of the importer. The past is not so easily changed. Indeed, the term "broker" itself connotes other than a simple agency relationship.

The trial court discussed its reasons for holding that customs brokers are not sim-

ply agents of the importer. But even on agency principles, the Customs Service failed in its obligations to the "principal" it now seeks to hold liable. The Customs Service never notified Cometals of its purported agent's bounced checks, neither in this case nor in prior importations where Loudon's checks for Cometals' duties were not honored.

> Third party disclosure to an agent is not imputed to the principal when the agent is acting adversely to the principal's interest and the third party has notice of this.

*Arlinghaus v. Ritenour*, 622 F.2d 629, 636 (2nd Cir.), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980). *See also* Restatement (Second) of Agency § 271 (1958). The detrimental reliance element of estoppel, *e.g.*, *Heckler v. Community Health Services, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984), was exacerbated by this silence. Further, any agency relationship between Loudon and Cometals vanished when Loudon comingled funds and diverted payments:

> [T]he authority of an agent terminates if, without knowledge of the principal, he acquires adverse interests or is otherwise guilty of a serious breach of loyalty to the principal.

Restatement, *supra*, § 112. The government knew of these adverse interests, and has not denied its knowledge of Loudon's financial practices. By the government's admissions, any agency authority was terminated by its and Loudon's actions adverse to Cometals' interest.

Cometals argued before the trial court that the Customs Service, in its tolerance of Loudon's misfeasances and in its failure to notify Cometals when the checks for Cometals' duties were dishonored, acted in a way that protected Loudon while prejudicing the importer. The government concedes in its brief that "there is no evidence on the record that the importer or surety were even aware that uncertified checks were being accepted". Loudon's bankruptcy ended a pattern of what Cometals describes as "kiting", facilitated by governmental violation of its own regulations.

The trial court was entitled to consider these circumstances in reaching its equitable decision. They can not be glossed over. The government argues that it was entitled to continue to process Loudon's succession of bad checks without advising the importer, even as it now seeks to hold the importer responsible for this clearly preventable occurrence.

The government argues that it accepted Loudon's uncertified check in this case because of Cometals' surety bond, but this is a different issue. I do not see how the presence of Cometals' bond is a sufficient excuse for the government's laxness, if not acquiescence, in Loudon's financial footwork when the Treasury regulations require the government to license only financially sound customs brokers. In view of the government's failure to meet its minimal regulatory obligations, it can not now argue that the statute

> 19 U.S.C. § 1648 ... [I]f a check so received is not paid the person by whom such check has been tendered shall remain liable for the payment of the duties ...

means not only the maker who tenders the check but the importer as well. The plain language of the statute excludes so expansive a reading. The statute itself accommodates the ever-present customs broker, and his complex relationship in such transactions.

Cometals' surety company bonded Cometals, not Loudon. The majority interprets Cometals' bond as Cometals' surety's acceptance of liability to the government for Loudon's diversion of the monies. The majority holds that because of the bond the government had no obligation to enforce its own regulations, or even to exercise minimal due care in its dealings with Loudon and particularly in its dealings with importers. The Court of International Trade held that the Customs Service was chargeable with "affirmative misconduct" in not requiring a bond of Loudon and in failing to audit and determine his financial responsi-

bility, as the law and Treasury regulations require. On this record, the imposition of equitable estoppel is supported by precedent.

Equitable estoppel against the government is imposed only in egregious circumstances, wherein to hold otherwise is offensive to one's sense of justice. The Supreme Court in *Heckler v. Community Health Services, Inc.*, 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984), concluded that it would not

> say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some *minimum standard of decency, honor and reliability* in their dealings with their Government. [Emphasis in original and added]

The Court in *Community Health Services* discussed various examples of governmental misconduct in which equitable estoppel was denied or granted depending on the facts, including *Immigration and Naturalization Service v. Miranda*, 459 U.S. 14, 17, 19, 103 S.Ct. 281, 282, 283, 74 L.Ed.2d 12 (1982) ("The Court of Appeals thus correctly considered whether as an initial matter, there was a showing of affirmative misconduct."); *Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) ("'It is the duty of all courts to observe the conditions defined by Congress for charging the public treasury.'") (quoting *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947)). 467 U.S. at 60 n. 12, 104 S.Ct. at 2224 n. 12.

The Court in *Community Health Services* stated that "at least two of our cases seem to rest on the premise that when the Government acts in misleading ways, it may not enforce the law if to do so would harm a private party as a result of government deception." *Id.* (citing *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 675, 93 S.Ct. 1804, 1817, 36 L.Ed.2d 567 (1973) (evidence of misleading information by government is pertinent to defense of whether it was reasonable to rely thereon); and *Moser v. United States*, 341 U.S. 41, 47, 71 S.Ct. 553, 556, 95 L.Ed. 729 (1951) (finding "misleading circumstances" the Court held that "elementary fairness" required estoppel)).

There are varied circumstances in which equitable estoppel has been imposed by the courts against the government. Among the circuits, see, *e.g.*, *Meister Brothers, Inc. v. Macy*, 674 F.2d 1174, 1177 (7th Cir.1982) ("the 'public has an interest in seeing its government deal carefully, honestly and fairly with its citizens'") (quoting *United States v. Wharton*, 514 F.2d 406, 412–13 (9th Cir.1975); *Corniel-Rodriguez v. Immigration and Naturalization Service*, 532 F.2d 301, 307 (2d Cir.1976) (refusing "to sanction a manifest injustice occasioned by the Government's own failures"); *United States v. Lazy FC Ranch*, 481 F.2d 985, 989 (9th Cir.1973) ("estoppel is available as a defense against the government if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel"); *Brandt v. Hickel*, 427 F.2d 53, 56 (9th Cir.1970) ("some forms of erroneous advice are so closely connected to the basic fairness of the administrative decision making process that the government may be estopped"); *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 103 (9th Cir. 1970) ("the dictates of both morals and justice indicate that the Government is not entitled to immunity from equitable estoppel in this case"). The Court of Claims has held similarly, see *Emeco Industries, Inc. v. United States*, 485 F.2d 652, 657, 202 Ct.Cl. 1006 (1973) (government not immune from estoppel where its denial would be "'contrary to equity and good conscience'") (quoting *Stevens Manufacturing Co. v. United States*, 8 F.Supp. 720, 724, 80 Ct.Cl. 183, 192–93 (1934)).

In *Air-Sea Brokers, Inc. v. United States*, 596 F.2d 1008, 66 CCPA 64 (1979), the Court of Customs and Patent Appeals stated that equitable estoppel could not be applied against the government in cases

involving import duties, based on its view of the distinction between governmental action in a sovereign capacity as opposed to a proprietary capacity, *id.* at 1011, a distinction inapt in the case at bar, as illustrated in the CCPA's reference to *Automobile Club v. Commissioner*, 353 U.S. 180, 183, 77 S.Ct. 707, 709, 1 L.Ed.2d 746 (1957), a tax case which held that the Commissioner was not estopped from correcting an error of law and thereby requiring payment of past taxes, *id.* at 1101 n. 8. In neither *Air-Sea Brokers* nor *Automobile Club* did the trial court find that there was affirmative misconduct; nor did the trial court in either case, in its equitable discretion, determine that the facts of the case warranted the application of the doctrine of equitable estoppel. Appropriately in view of the limited standard of review with respect to such issues, see discussion *ante*, each appellate court and in *Automobile Club* the Supreme Court affirmed. Therefore, unlike the situation now before us, in *Air-Sea Brokers* and *Automobile Club*, imposts were required to be paid rather than waived in their entirety. The case of *United States v. Reliable Chemical Co.*, 605 F.2d 1179, 66 CCPA 123 (1979), relied on by the majority, does not relate to the collection of duties, but to the *jurisdictional* issue of the filing of a protest before instead of after liquidation.

The Court of International Trade thus declined to apply the CCPA's sweeping dictum, stating correctly that its holding does not "sanction *all* possible government misconduct in the area of duty collection, particularly when it displays a blatant disregard for the public interest in a matter of utmost importance." 605 F.Supp. at 304 (emphasis in original).

As is made clear in the extensive precedent in which courts have considered governmental conduct, whether the government can be estopped depends on the nature of both the governmental action and the governmental misconduct. The trial court referred to the general rule that " 'laches or neglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest' ", 605 F.Supp. at 303–04 (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917)), a rule tempered by judicial determination of whether the government met a "minimum standard of decency, honor, and reliability", in the words of *Community Health Services.* In balancing these factors, the courts are obliged to administer laws fairly, even when the government is a party. Neither the government nor its citizens is relieved from the omnipresent obligation to "turn square corners" with the other. *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229, 82 S.Ct. 289, 301, 7 L.Ed.2d 240 (1961) (Black, J., dissenting), *quoted in Community Health Services*, 467 U.S. at 51 n. 13, 104 S.Ct. at 2224 n. 13; *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 387–88, 68 S.Ct. 1, 4–5, 92 L.Ed. 10 (1947) (Jackson, J., dissenting).

Equitable estoppel is not legal estoppel: it is the fruit of the search for justice in an often complex balance of interests, rights, and authorities. The laws requiring federal regulation of customhouse brokers were designed to protect both importers and the treasury, as is clear from the legislative history. Balancing the equities as between these two entities with respect to the circumstances at bar, the Court of International Trade brought its wisdom and experience in customs law and practice. None of the decisions cited by the government or relied on by the majority is contravened by the trial court's conclusion in this case. The decision of the Court of International Trade is supported by law and precedent and is in the interest of justice.

The Treasury changed its regulations in 1982, by requiring customs brokers to advise importers in writing that importers may pay customs duties directly to the United States rather than to the broker, and that payment to the broker does not relieve the importer of liability. 19 C.F.R. § 111.29(b)(1). This change reinforces the view that the prior regulations and practices were notably imperfect. The trial court's decision is not contrary to law nor

an abuse of its equitable discretion, and should not be disturbed.